# Expert Report

Karen Townsend v The Northwestern Mutual Life Insurance Company

Laura B Parker, CLU®, ChSNC®, CDMS
Seacoast Benefits LLC
8-9-2021

EXHIBIT 1

EXHIBIT F

## Table of Contents

Experience...................................................................................................................................... 2

Claim File Summary.......................................................................................................................3-7

Insurance Application Summary……………………………………………………………………………………………. 8

Insurance Industry Regulation……………………………………………………………………………………………. 9

Insurance Industry Claims Handling Standards ...................................................................10-11

State Specific Claims Handling Regulations……………………………………………………………………….12-13

Analysis ...............................................................................................................................14-26

Conclusion..........................................................................................................................27-28

CV ........................................................................................................................................... 29

Sources/Research ................................................................................................................... 30

Document List ........................................................................................................................ 31

Expert Witness Testimony………………………………………………………………………………………………..32

EXHIBIT F

Laura B Parker, CLU®, ChSNC®, CDMS
Seacoast Benefits LLC
lparker@seacoastbenefits.net
207-703-6820

# Expert Report

## Introduction

This report provides an opinion as to the handling of the claim submitted by Karen Townsend with The Northwestern Mutual Life Insurance Company.  All documents considered in formulating this opinion have been listed at the end of this report.

## Experience and Background

**Overview**.  I have over 25 years of experience in the insurance industry with specialized knowledge in claims and industry practices, procedures and customs.

I began my insurance career with Chubb Life America in the Individual Disability Income Claims Department; there I handled all aspects of the administration of individual disability claims.  I was employed by UNUM, now known as Unum Group, from 1994-2000 in the Individual Disability Claims Department.  I was initially a part of the Association Disability Claims Unit.  I was promoted to the Complex Claims Unit, and then went on to a Consultant role in the Appeals Unit.  In 2000, I was hired by Disability Reinsurance Management Services (DRMS) as Association Disability Claims Manager.  In that role, I was responsible for all aspects of the newly-formed Association Claims Unit.  I met with numerous agencies, associations, and insurers to assist in devising and implementing claims processes and procedures.  While at DRMS, I also managed the Short Term Disability Claims team, created and implemented a Quality Review program for the claims department, and handled appeals for numerous client companies.  I joined Salt Associates in December 2012 as an Appeals Consultant.  I was solely responsible for providing client companies with industry best practices, Third Party Non-binding Arbitration and appeals expertise for Short Term Disability, Long Term Disability, Waiver of Premium, Life Insurance and Critical Illness claims.

**Certifications and Licenses.**  I am a licensed Maine Life and Health Insurance Consultant; Maine Life and Health Producer; Maine Property and Casualty Adjuster; New Hampshire Life, Accident & Health Producer; and New York Accident and Health Independent Adjuster.  I hold the following insurance designations:  Chartered Life Underwriter (CLU®); Chartered Special Needs Consultant (ChSNC®); Associate, Life and Health Claims (ALHC); Health Insurance Associate (HIA); Associate, Customer Service (ACS); Fellow, Life Management Institute (FLMI); and Certified Disability Management Specialist (CDMS).

**Education.**  BA, Business Administration, University of New Hampshire; MBA, Business Administration, Southern New Hampshire University.

**Compensation.**  Claim file review and report preparation: $200 per hour; Deposition testimony: $250 per hour; and Trial testimony: $300 per hour.

EXHIBIT F

## Claim File Summary

- Policy Number:  22219582
- Policy:   Individual – Term Life
- Issued:  9.20.2017

- Policy Number:  22247352
- Policy:  Survivorship Whole Life
- Issued:  10.20.2017

The claim file contains a document (NORTHWESTERN1166) created by Shaletha Hankins dated April 26, 2019 indicating notification from Financial Representative Scott Van Sickle of the death of Darren Townsend on April 18, 2019 by suicide.

An email was sent to Mike Jones on April 26, 2019 advising of the receipt of a death notification for one of his clients (NORTHWESTERN1167).

On May 3, 2019, Northwestern Mutual Life Benefits Consultant Justine Strupp spoke with Scott Van Sickle (NORTHWESTERN0545) and indicated that she walked through the contestable review process with him.  She also provided the Claim Packet for Karen Townsend.

A death certificate was provided by Scott Van Sickle (NORTHWESTERN0498).

The file contains a Contestable Life Worksheet (NORTHWESTERN0857).  The policies under review were listed as Policy 22219582 issued on September 20, 2017 and Policy 22247352 issued on October 20, 2017.  It was indicated that the Medical History Questionnaire (MHQ) of June 6, 2017 was used for the applications dated June 14, 2017 and August 16, 2017.

The file contains an email from Monica Esch Life Technical Underwriting Consultant, Risk Selection Strategy to Cindy Snoda dated May 3, 2019 (NORTHWESTERN0502) indicating the following:

*I reviewed the medical records for this this, #22219582.*

*The Insured notes in 2016 he was recently seen by a therapist who prescribed lamotrigine and sertraline. The Insured has a long history of depression and the records we have date back to 2012 with no indication of any bipolar history.  The Insured admits to a depression history for which he was treated and then the medications were discontinued and re-prescribed in 2016.*

*After discussing with the other Life Technical Consultants, we agreed given that we have records from the personal physician and the Insured admitting to a long-standing depression history, we would have not requested the psych records for this amount of coverage.*

A Records Request dated May 3, 2019 (NORTHWESTERN0544) indicated the following summary:

*This is contestable claim.  Justine Strupp is the claims analyst.  Joint Life contract 22247352, while still inforce and not payable, is also part of the contestable review for this contract, at underwriting Darren's information was submitted as part of application 22247419.  Once the contract information is confirmed*

3

EXHIBIT F

*with the FR we are asking that you contact the spouse, Karen Townsend for complete the interview.  We HAVE NOT received the signed authorizations back.  The BAS case is #4016529711.*

The claim file contains a letter dated May 3, 2019 (NORTHWESTERN0547-0567) from Justine Strupp to Karen Townsend acknowledging notification of claim under Policies 22219582 and 22247352.

On May 6, 2019, Tony Breitrick, Sr. Investigative Specialist, provided a Confidential Contestable Death Preliminary Results Report (NORTHWESTERN0482-0496) consisting of media, internet and social media searches.  Copies of the obituary, Facebook and web page findings were provided.

On May 7, 2019, Scott Van Sickle sent an email, with attachments, to Justine Strupp indicating the following (NORTHWESTERN0533-0541):

*Attached please find the temporary death certificate, claim forms, and authorizations.  Let me know if I missed anything or if you need anything further.  Also, Karen is available tomorrow, 5/8, at 11:00 AM Mountain for an interview.*

The file contains an Investigative Report dated May 8, 2019 from David Thorpe (NORTHWESTERN0521-0525).  The report was a summary of a conversation between David Thorpe and Ms. Karen Townsend regarding Darren Townsend's death, application review and medical history review.   At the end of the phone interview, Karen expressed willingness to talk about anything else if additional questions arose and made herself available.

On June 4, 2019, Tony Breitrick provided Autopsy and Toxicology Reports (NORTHWESTERN0463-0474).

The claim file contains 16 pages of medical records from Dr. Larry Sanders (NORTHWESTERN0426-0441) from February 2019 to April 2019, received on June 11, 2019.

Justine Strupp documented a summary of Dr. Sanders' medical records (NORTHWESTERN0425) with the following, in part:

*Nothing of additional concern prior to the issue date noted in these medical records and we accepted the depression history at UW.*

On June 15, 2019, 111 pages of medical records were received from Highlands Behavioral Health (NORTHWESTERN0286-0396).  The records pertained to an involuntary admittance dated October 15, 2018 through October 16, 2018.

On June 20, 2019, Justine Strupp documented a summary of the Highland Behavioral Health records (NORTHWESTERN0285) with the following:

*Records from 10/15/18-10/16/18 Inpatient Psychiatric Services. Transfered here after attempting suicide by lacerating left wrist. Experiencing increasing depression off Zoloft; he & wife committed to a polyamorous relation with a second couple and he felt rejected.*

*Diagnosis of recurrent Major Depressive*

EXHIBIT F

*Disorder and moderate Ethyl Alcohol Disorder;*
*treated with Zoloft, Abilify, and Vistaril.*
*Notes indicate drinking 2-5 drinks per day*
*1-2X per week; also used cocaine 1-2x only*
*but age at first use 43; last use 3/18.*
*Insured would have been 43 as of 6/7/2016*
*so this is within two years of the app date*
*and is a potential underwriting concern.*

*Also had put a noose in the basement and*
*planned to hang himself.*

*Outside therapist seen the summer before*
*named Tupa; NB needs to review due to cocaine*
*use so they will address whether or not*
*they want records, however, depression history*
*was accepted at UW.*

*Note of cocaine use at age 43 is on page*
*21.*

The file contains an email from Tony Breitick along with a copy of the Sheriff's Report
(NORTHWESTERN0248-0276) and the following commentary:

*Report documents that the Insured has struggled*
*with mental health and has been on Zoloft*
*for depression for the last 26-27 years.*
*Mostly saw his primary care Dr. Lawrence*
*Wildner. The day of his death he has an*
*apt at Denver Wellness and Assoc. He had*
*a previous suicide plan to hang himself*
*at school. No suicide note was found.*

*Policy issued 9/20/2017.*

The file contains a memo dated July 24, 2019 from Melissa Guidinger to Justine Strupp
(NORTHWESTERN0233) indicating the following:

*Policy 22219582 for $1,000,000 Level Term 20, and an issue date of 9-20-2017 was issued at a Premier*
*Non-Tobacco risk classification. Policy 22247352 for $300,000 of Survivorship Complife with a Premier*
*Non-Tobacco classification was issued 10-20-2017. The Medical History Questionnaire was dated 6-6-*
*2017.*

*During underwriting, the personal MD records were ordered and reviewed from Dr. Larry Wilner.*
*Records noted a history of depression, ongoing for at least 10 years. The report noted symptoms were*
*controlled on medication, and therefore this history was accepting without a rating.*

5

EXHIBIT F

*During the contestable review process, we received medical records from Highland Behavioral Health. Within the records, the Insured admitted to cocaine use 1-2 times beginning 6/7/2016- age 43. This would have been within 1 year, or slightly past one year of the application, and of the MHQ dated 6-6-2017. This was not disclosed on the MHQ.*

*Had this information been disclosed on the Medical History Questionnaire dated 6/6/2017, we would have declined to offer a policy.*

Justine Strupp asked Scott Van Sickle to complete the Financial Representative Questionnaire on August 5, 2019 (NORTHWESTERN0238).  The file contains a completed Financial Representative Questionnaire dated August 5, 2019 (NORTHWESTERN0239-0241).

A phone call took place on August 27, 2019 at which time Justine Strupp advised Scott Van Sickle that the contestable review was complete and that no payment would be made due to misrepresentation (NORTHWESTERN0231).

The file contains a note (NORTHWESTERN0229) indicating the following:

*Chris AMIDZICH and I met with Monica Esch of DB to ask that they take a second look at the denial that was done on this claim. We want to make sure they are looking at all the records received. She advised that they would look right away this morning as Chris and I were meeting with the FR this afternoon via skype.*

On September 9, 2019, Monica Esch sent an email to Justine Strupp (NORTHWESTERN0229) stating the following:

*I reviewed the medical records for this Insured and agree with the original assessment that had we known about the cocaine use we would have declined the application.*

*It is specific in the records where he indicated that he did cocaine at age 43.*

*Please let me know if there are any additional questions. Monica*

A letter was sent to Ms. Townsend dated September 11, 2019 (NORTHWESTERN0056-0058) from Justine Strupp indicating the following, in part:

*Unfortunately, our contestable review has shown that information Darren provided in the MHQ, Declaration 1, and Declaration 2, all part of the applications for the policies, was not accurate and significantly affected our underwriting of his applications.*

*Part of our review involved obtaining medical records from Highland Behavioral Health. Those records detail an October 2018 admission following a suicide attempt, and include the following:*

*"Have you used any psychoactive or mood altering substances within the past 12 months?"*

| Substance | Amount/Frequency/Route | Duration of Use | Age of 1st Use | Last Use |
|---|---|---|---|---|
| Cocaine | 1-2 x, snort | 1/2 x only | 43 | 3/2018 |

6

EXHIBIT F

*If Darren was 43 years of age as of the date he first snorted cocaine, then he first snorted cocaine as early as June 7, 2016, which would have been well within the ten-year period of time in question in Question 4c of the MHQ.*

*Had Northwestern Mutual been aware of Darren's prior history of cocaine use at the time of application, the applications would have been underwritten in a different manner such that the Individual Policy would ultimately not have been issued and a different Survivorship policy with increased premiums would have been issued as he would not have been considered individually insurable.*

*Therefore, I regret to inform you that Northwestern Mutual is rescinding both the Individual Policy, Policy 22245419, and the Survivorship Policy, Policy 22247352, and returning all premiums paid for these policies. A check will be sent under separate cover. The rescission of the policies results in them being treated as if they never existed or were in force. We are also hereby denying your claim under the Individual Policy because there is no policy under which a claim could be made.*

7

EXHIBIT F

## Insurance Application Summary

- Policy Number:  22219582
- Policy:   Individual – Term Life
- Issued:  9.20.2017

- Policy Number:  22247352
- Policy:  Survivorship Whole Life
- Issued:  10.20.2017

On June 6, 2017, Mr. Darren Townsend completed a Medical History Questionnaire (MHQ) (NORTHWESTERN0603-0604).  At that time, he indicated that his treating provider was Dr. Larry Wilner.  Mr. Townsend indicated that he was a non-smoker, had a history of depression, acid reflux, ulcer, and treatment for left knee and foot bunions.

Question 4 (c) of the MHQ asked the following:

*In the last 10 years, have you used marijuana, cocaine, heroin, methamphetamine, hallucinogens, or any other drug or substance?*

The question is answered: "no."

The file contains records of a Paramedical Examination dated June 6, 2017 (NORTHWESTERN0605) by Portamedic.

On August 16, 2017, Mr. Darren Townsend signed an Individual Life Insurance Application (NORTHWESTERN0595-0608).  The file contains the signed Application; signed Authorization (NORTHWESTERN0607); June 2017 paramedical examination; and June 2017 MHQ.  In addition, Mr. Townsend signed a Personal Health and Status Declaration (NORTHWESTERN0614) on August 16, 2017.

The file contains a Client History Interview dated August 17, 2017 (NORTHWESTERN0616-0632).  This was conducted by telephone by interviewer WIL46 from 12:40 pm – 1:00 pm.

A Policy Delivery Acknowledgment is dated September 20, 2017 (NORTHWESTER0700) as well as a Personal Health and Status Declaration (NORTHWESTERN0701).

Mr. Darren Townsend signed a Personal Health and Status Declaration on October 26, 2017 (NORTHWESTERN0810) regarding the delivery of Policy 22247352.

EXHIBIT F

## Insurance Industry Regulation

The Insurance Industry is a highly regulated business due, in part, to the complexity of insurance policies, pricing, and the need for adequate and appropriate coverage.  Fundamentally, government regulation of the insurance industry has been put in place to protect the consumer.  In order to protect the consumer, insurance regulations can be broken down into categories including:  market regulation and solvency regulation.

Market regulation of the insurance industry focuses on treating claimants and policyholders fairly.  Solvency regulation ensures that insurance companies are financially stable and can meet their financial obligations and promises.  Insurance regulation can further be broken down into objectives including:  market conduct, consumer services, insurer licensing, product regulation, producer and adjuster licensing, and financial regulation.

Insurance companies are regulated primarily by the individual states.  Individual states enact legislation and establish laws under which insurance regulators operate.  The legislation and laws put in place by the individual states regulate, monitor and ensure that insurance companies treat policyholders fairly and that they can meet their financial obligations and promises.

The NAIC or National Association of Insurance Commissioners is an organization that was created by state insurance regulators in 1871 to assist with regulatory oversight and the development of uniform financial reporting.  Through the NAIC, individual state insurance regulators establish standards and best practices, conduct reviews and audits, and coordinate regulatory oversight for the 50 states, the District of Columbia and five US territories.

As noted above, one of the key categories of regulation of the insurance industry pertains to market regulation.  Market regulation, in the insurance industry, is focused on ensuring that consumers are treated legally and fairly.  Specifically, market regulation attempts to ensure that consumers, or policyholders, are paying fair prices for insurance coverage, have access to appropriate, fair, beneficial and adequate insurance coverage, and are treated in ways that are both legal and fair.

Insurance is a means to protect oneself against a financial loss.  Essentially, a policy or contract is issued, premiums must be paid, and a claim may or may not occur.  A policyholder may be referred to as a claimant, if and when a claim is filed under the insurance contract.

In order to protect policyholders, at the time of claim, laws, regulations, and standards have been established.  Once such law in particular is called the Unfair Claims Settlement Practices Act drafted by the NAIC.  Most states have adopted the law, or a version thereof.  The model law protects policyholders from unfair and unjust behavior by insurers in the claims process.  Violations of the model law are serious and may result in lawsuits, penalties, fees, additional market conduct examinations and tarnished reputations, to name a few.

EXHIBIT F

## Insurance Industry Claims Handling Standards

All Disability, Long Term Care and Life insurers, and those who administer those types of insurance claims are expected to provide thorough, fair, and objective reviews as to eligibility for benefits.  While it is a fundamental understanding that insurers and their claims analysts and managers are expected to conduct claim reviews in a professional, objective, fair, and thorough manner, numerous insurance industry sources have published claims practices and principles.  Specifically, NAIC, state insurance departments, the International Claims Association, market conduct examinations, and various other insurance industry sources have published insurance claims practices and principles.  Life Insurance carriers and their claims handlers are able to access, utilize and refer to industry practices and principles as outlined in these sources in order to ensure fair and equitable claims handling.

More specifically, through the NAIC, state insurance regulators establish standards and best practices, conduct peer reviews, and coordinate their regulatory oversight. NAIC staff support these efforts and represent the collective views of state regulators domestically and internationally. NAIC members, together with the central resources of the NAIC, form the national system of state-based insurance regulation in the U.S. (www.naic.org)

The Disability, Long Term Care and Life Insurance industries consider the following to be unfair claims practices and are outlined in the Unfair Claims Settlement Practices Act drafted by the NAIC:

- Knowingly misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverage at issue.
- Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies.
- Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies.
- Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear.
- Compelling insureds or beneficiaries to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them.
- Refusing to pay claims without conducting a reasonable investigation.
- Failing to affirm or deny coverage of claims within a reasonable time after having completed its investigation related to such claim or claims.
- Attempting to settle or settling claims for less than the amount that a reasonable person would believe the insured or beneficiary was entitled by reference to written or printed advertising material accompanying or made part of an application.
- Attempting to settle or settling claims on the basis of an application that was materially altered without notice to, or knowledge or consent of, the insured.
- Making claims payments to an insured or beneficiary without indicating the coverage under which each payment is being made.
- Unreasonably delaying the investigation or payment of claims by requiring both a formal proof of loss form and subsequent verification that would result in duplication of information and verification appearing in the formal proof of loss form.

10

EXHIBIT F

- Failing in the case of claims denials or offers of compromise settlement to promptly provide a reasonable and accurate explanation of the basis for such actions.

In order to ensure objective, thorough and fair claim evaluations, insurance industry sources have fundamentally agreed that life insurance carriers and those adjudicating life insurance claims comply with the following pertinent guidelines:

- Fully investigate all pertinent facts of claims and base claim decisions on facts.
- Consider all claim documentation fully and fairly.
- Err in favor of the insured when claim evaluations are inconclusive.
- Ensure the burden to prove eligibility for benefits is not placed inappropriately on the claimant.
- Provide training pertaining to procedures, policy language, medical, vocational, financial and legal issues.
- Remain objective in the assessment of eligibility for benefits and not bias the claim evaluation in any manner.
- Make claims decisions independent of company financial goals.
- Consider all medical documentation, Independent Medical Examinations, and attending physician's statements fully, fairly and objectively.
- Accept claimants' providers' records and opinions unless shown to be inconsistent with clinical and diagnostic standards.
- Utilization of outside, independent medical resources when there is conflicting medical evidence or conflicting medical opinions.

As noted above, insurance regulation is in place, in part, to assist in the process of ensuring that claimants and policyholders are treated fairly.  In order to assist insurers with their obligation to treat claimants fairly, there are resources readily available that may be utilized.  For example, insurers should refer to their own internal processes and procedures, claims manuals, market conduct examinations, the International Claims Association, the NAIC, and/or individual state insurance departments.

11

EXHIBIT F

## State Specific Claims Handling Regulations

The NAIC has indicated that Colorado adopted the Unfair Claims Settlement Practices Act.  The model adoption is Colorado Statute 10-3-1104 and indicates the following, in relevant part:

Unfair claim settlement practices:  Committing or performing, either in willful violation of this part 11 or with such frequency as to indicate a tendency to engage in a general business practice, any of the following:

> (I)  Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;  or

> (II)  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or

> (III)  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or

> (IV)  Refusing to pay claims without conducting a reasonable investigation based upon all available information; or

> (V)  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or

> (VI)  Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;  or

> (XIV)  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;  or

> (XVII)  Failing to adopt and implement reasonable standards for the prompt resolution of medical payment claims.

As indicated above, Colorado has adopted the Unfair Claims Settlement Practices Act which is codified as Colorado Revised Statute 10-3-1104.  As one can see, Colorado Revised Statute 10-3-1104, along with the NAIC's Unfair Claims Settlement Practices Act, requires insurers to conduct a fair, reasonable, equitable, timely claims reviews.  By adopting the NAIC's Unfair Claims Settlement Practices Act, insurers doing business in Colorado have the obligation to perform fair, timely, reasonable and equitable claims reviews.

From a claims perspective, if a claimant feels that they have been treated unfairly, there are remedies that may be sought.  For example, a complaint may be filed with the State Insurance Department, an appeal/reconsideration may be filed with the insurance company, or legal representation may be considered and pursued.

In order to determine whether the Unfair Claims Settlement Practices Act has been complied with, an evaluation must take place.  The claim file is paramount in the review.  The actions, documents, procedures and correspondence contained in the claim file must be reviewed and compared to accepted industry claims handling standards and regulations.

12

EXHIBIT F

It is obvious, but worth noting, that the Unfair Claim Settlement Practices Act is focused on the claims function of an insurance company.  The claims department handles claims that are filed.  When claims are approved, money flows out of company in the form of benefits.  Put simply, money flows out of the claims department.  Money does not flow into the claims department.  Money stops flowing out of the claims department when claims are denied, terminated or closed.  Liabilities are subsequently decreased.

In the claims department, there are no "sales goals" or expected revenues.  Instead, goals or targets in the claims department consist of decreasing an insurance company's major liability, or claim/benefit payments to insureds.  Again, money flows out of the company in the claims department.   Goals, targets and profits are met in companies when assets exceed liabilities.   While inflowing premiums are a major asset of insurance companies, benefit payments are a major liability for insurance companies.

Obviously companies intend to be profitable and remain solvent; however, particularly with an insurance company, regulation is in place to ensure that claimants and policyholders are treated fairly and equitably during the process.  Neither industry standards nor regulations allow insurers to deny claims unfairly, to unfairly target specific claims for closure, or to deny claims without a reasonable, equitable evaluation.   Regardless of the need to remain solvent, unfair claims handling practices are not permitted.

As claim and/or benefit payments that flow out of an insurance company, by their very nature, are considered liabilities, industry regulation is in place to de-incentivize insurers from performing unfair claims handling practices and unfairly, prematurely, and inaccurately targeting and closing claims.

13

EXHIBIT F

## Analysis

Mr. Darren Townsend was issued Policy #22219582 (Individual Life Insurance) as of September 20, 2017 and Policy #2247352 (Survivorship Joint Life) as of October 20, 2017.  The policies were issued based on information provided by Mr. Townsend on June 6, 2017 (MHQ); August 16, 2017 (Individual Application/Personal Health and Status Declaration #1); August 17, 2017 (telephone interview); and October 26, 2017 (Personal Health and Status Declaration #2).

In April 2019, Northwestern Mutual was notified of Mr. Townsend's death on April 18, 2019.  The claim process was then initiated.  As indicated in the claim file, a letter was sent to Ms. Karen Townsend on May 3, 2019 along with the necessary paperwork for completion.  The file reflects that the completed claim forms, death certificate, and authorization were submitted on May 7, 2019.

As Mr. Townsend's death occurred within two years of the policy effective dates, Northwestern Mutual commenced a contestable investigation.  The claim file reflects that Monica Esch, Life Technical Underwriting Consultant, Risk Selection Strategy, reviewed the medical records for the file on May 3, 2019.  At that time, she presumably would have reviewed the medical records that were contained in the Underwriting File, as medical records had not been requested, received, or reviewed from a claims perspective as of May 3, 2019.  Ms. Esch confirmed that Mr. Townsend disclosed his long-standing depression history on his applications for coverage.

Also part of the claims/contestable investigation was a Driver Record Service Report, as well as a check of Mr. Townsend's obituary and social media pages.  In addition, a phone conversation took place between David Thorpe and Ms. Karen Townsend on May 8, 2019 to discuss the circumstances around Darren's death.  On June 4, 2019, Northwestern Mutual was provided with Autopsy and Toxicology Reports.

By that point in time, June 4, 2019, the claim file does not reflect any documented concerns pertaining to the validity of the information provided by Mr. Townsend on his applications and declarations at the time of underwriting.  Specifically, it was noted that Northwestern Mutual was aware of Mr. Townsend's history of depression at the time of underwriting and would not have requested psychiatric records for the amount of coverage applied for.

The claim file reflects that medical records were received from Mr. Townsend's provider, Dr. Larry Sanders, on June 11, 2019.  The records were reviewed by claims analyst Justine Strupp.  The claim file states that there was "nothing of additional concern prior to the issue date noted in these records and we accepted the depression history at UW".

Again, by this point in time, or June 11, 2019, after verifying Mr. Townsend's driving history; performing a social media background check; interviewing Ms. Townsend; receiving the Autopsy and Toxicology Reports; and reviewing medical records from Mr. Townsend's physician, there still were no documented concerns as to the validity of the information Mr. Townsend had provided at the time of underwriting.

On June 15, 2019, records from Highlands Behavioral Health were received.  Justine Strupp noted in the file that Mr. Townsend had been an inpatient at the center from October 15, 2018 through October 16, 2018, after being transferred there from another facility. She further noted cocaine use at age 43 (which had been identified on page 21 of the notes) as a potential underwriting concern, treatment by an

outside therapist, and that 'NB' would need to "review due to cocaine use so they will address whether or not they want records".

Page 21 of the Highlands Behavior Health records that Ms. Strupp referred to indicates the following:

| ☐ DENIES | | **SUBSTANCE USE** | | | | |
|---|---|---|---|---|---|---|
| ☒ Yes ☐ No | **HAVE YOU USED ANY PSYCHOACTIVE OR MOOD ALTERING SUBSTANCES WITHIN THE PAST 12 MONTHS?** | | | | | |
| ☒ Alcohol ☐ Amphetamines ☐ Benzodiazepines ☐ Barbiturates | ☐ Caffeine ☐ Cocaine/Crack ☐ Hallucinogens ☐ Inhalants | ☐ Marijuana ☐ Methadone ☐ Nicotine ☐ Opiates | | ☐ Pain Medication ☐ Sedatives ☐ Other:_____ | | |
| Substance top 3 | Amount/Frequency/Route | Duration of Use | Age of 1ˢᵗ use | Last use | Amount used in last 24-48 hours |
| ETOH | 2-5 DRINK / 1-2 x WK / ORAL | 10+ YRS | 16 | 10/14 | 4 DRINKS |
| COCAINE | DID 1-2 x, SNORT | 1-2 x ONLY | 43 | 3/18 | φ |

UTOX results: ⊖ FOR ALL, EXCEPT ETOH

Longest period of sobriety: N/A          Drug of choice (specific): ETOH

Do You Smoke: ☐ Yes ☒ No          If Yes how much a day: N/A

| ☐ N/A | **SUBSTANCE USE/WITHDRAWAL SYMPTOMS** |
|---|---|

Current Symptoms/Experiences related to withdrawal *(check all that apply)*:
☐ Sweats ☐ Nausea/Vomiting ☐ Cramps ☐ Fever ☐ Tremors ☐ Anxiety ☐ Cravings     NO WITHDRAWAL
☐ Hallucinations ☐ Black outs ☐ Seizures ☐ Irritability ☐ Delirium ☐ Paranoia     SYMPTOMS
☐ Other:_____

Has the patient ever received Chemical Dependency Treatment? ☐ Yes ☒ No

Where:_____ When:_____

Outcome:_____

Additional information regarding patient's substance use:

Has substance use ever impacted you in the following areas:

Family: ☐ Yes ☒ No   If yes Describe: _____

Financial: ☐ Yes ☒ No   If yes Describe: _____

Job/School: ☐ Yes ☒ No   If yes Describe: _____

Medical: ☐ Yes ☒ No   If yes Describe: _____

Other: ☐ Yes ☐ No   If yes Describe: _____

TOWNSEND, DARREN     ....73

The file then reflects that Melissa Guidinger sent Ms. Strupp a memo on July 24, 2019 indicating the following:

*During the contestable review process, we received medical records from Highland Behavioral Health. Within the records, the Insured admitted to cocaine use 1-2 times beginning 6/7/2016 – age 43. This would have been within 1 year, or slightly past one year of the application, and of the MHQ dated 6-6-2017. This was not disclosed on the MHQ.*

*Had this information been disclosed on the Medical History Questionnaire dated 6/6/2017, we would have declined to offer a policy.*

Financial Representative Scott Van Sickle completed the Financial Representative Questionnaire on August 5, 2019 in which he indicated that he did not ask the questions on the MHQ.

Ms. Guidinger's statement indicating that "medical records" from Highlands Behavioral Health were received indicating that Mr. Townsend "admitted to cocaine use 1-2 times beginning 6/7/2016 – age 43"

15

EXHIBIT F

is inaccurate.  Intake notes were received from Highlands Behavioral Health, not medical records.  In addition, the information contained in the intake notes contained information that differed from all the actual medical records on file.  Lastly, Mr. Townsend did not admit to using cocaine "beginning June 7, 2016" on that form.

**A reasonable insurer would have fully investigated the information from the intake notes to ensure a full, fair, thorough claims decision.  Specifically, the medical records from Mr. Townsend's treating providers differed from the information contained in the intake notes.  Yet, all the weight was given to the one intake note as opposed to giving at least equal weight to all the other medical records from treating providers.  Misrepresenting relevant facts and refusing to pay claims without a reasonable investigation is not in compliance with industry good faith claims handling standards.**

Monica Esch reviewed the file again on September 9, 2019 and stated that it was "specific in the records where he indicated that he did cocaine at age 43."

It should be noted that Ms. Esch's statements pertaining to the specificity of cocaine use at age 43 in the records is not accurate.  Again, the first mention of cocaine use is contained in an intake note from October 2018.  The intake notes from Highlands Behavior Health are not medical "records" that specifically state that Mr. Townsend did cocaine at age 43.  On the contrary, the intake notes provided by Highlands Behavior Health contained information that could have been interpreted in a number of different ways.

**Instead of performing a full, fair, thorough review with Mr. Townsend's interests placed at least equally to those of the insurer, Northwestern Mutual chose to place the greatest weight on intake notes that would be most favorable to itself.  Placing its own interest above those of the insured and interpreting information to the detriment of the insured are not in compliance with industry good faith claims handling standards.**

After Ms. Esch's comments on September 9, 2019, a letter was sent to Ms. Townsend dated September 11, 2019 indicating that Northwestern Mutual  was denying the claim and rescinding the policies due to the following:

*Part of our review involved obtaining medical records from Highland Behavioral Health.  Those records detail an October 2018 admission following a suicide attempt, and include the following:*

*"Have you used any psychoactive or mood altering substances within the past 12 months?"*

| Substance | Amount/Frequency/Route | Duration of Use | Age of 1st Use | Last Use |
|---|---|---|---|---|
| *Cocaine* | *1-2 x, snort* | *1-2x only* | *43* | *3/2018* |

Northwestern Mutual does not cite any other information from which it based its decision to rescind coverage and deny benefits other than the October 15, 2018 Highlands Behavioral Health Comprehensive Assessment Tool (NORTHWESTERN0306) mention of cocaine.  Northwestern Mutual's reasoning for the rescission and denial was based on the opinions that the information provided on the MHQ and two Declarations, from 2017, were not accurate.

16

EXHIBIT F

As previously indicated, Mr. Townsend completed a Medical History Questionnaire on June 6, 2017 (NORTHWESTERN0604), at the age of 43, at which time he responded NO to the following question:

*In the last 10 years, have you used marijuana, cocaine, heroin, methamphetamine, hallucinogens, or any other illegal drug or substance?*

On August 16, 2017, now 44, Mr. Townsend completed an Individual Life Insurance Application but was not asked to provide any additional medical questionnaires or answer any questions pertaining to alcohol or drug use.

A Personal Health and Status Declaration was signed by Darren Townsend on August 16, 2017 (NORTHWESTERN0614) indicating that the answers provided in the most recent application for insurance were still true, correct and accurate.

The claim file contains a Client History Interview of August 17, 2017 (NORTHWESTERN0626) indicating no illegal drug use in the past 10 years.

Mr. Darren Townsend completed a Personal Health and Status Declaration on September 20, 2017 stating that the answers previously provided were still true, accurate and correct.

At the time of intake at Highlands Behavioral Health, on October 15, 2018, Mr. Townsend was 45 years old.

Northwestern Mutual states that it performed a "contestable review", at the time of claim, and that the review showed that Mr. Townsend did not provide accurate information at the time of underwriting. As a result of the "contestable review", the only piece of information that Northwestern Mutual cited as inconsistent with the application information was the mention of cocaine during the October 15, 2018 intake for attempted suicide.

Mr. Townsend signed and dated the June 2017 MHQ and attended a paramedical examination in 2017. Based on the information in the file, Mr. Townsend signed a Declaration in August 2017, an application in August 2017, and was interviewed in August 2017. Mr. Townsend is the one who signed the 2nd Declaration dated September 20, 2017. It was Mr. Townsend's medical providers' that were contacted at the time of underwriting. It was Mr. Townsend's medical records that were reviewed at the time of underwriting. Northwestern Mutual was aware of, had access to, and Mr. Townsend disclosed, his medical, financial and vocational history as of, and prior to, September 20, 2017.

Yet, at claim time in 2019, Northwestern Mutual did not investigate the validity of the October 15, 2018 intake notes from Highlands Behavioral Health. Specifically, at the time of claim in 2019, Northwestern Mutual contacted Financial Representative Van Sickle to question him about the validity of the information provided at the time of the 2017 application and underwriting. However, Northwestern Mutual did not contact the interviewer from Highlands Behavioral Health to verify the validity of the information provided in the intake interview from October 2018.

**Had Mr. Townsend's interests been placed at least equally to those of the insurer, Northwestern Mutual would have made efforts to verify and investigate the validity of the very information it was using to deny benefits. The fact that Northwestern Mutual chose to take steps to verify with Mr. Van Sickle the accuracy of information about drug use contained in the 2017 application and not make any effort to verify the accuracy of the information about drug use contained in the 2018 intake form**

EXHIBIT F

**demonstrates Northwestern Mutual's bias and that it was placing its own interests above those of the Mr. Townsend's.  It is unreasonable and not in compliance with industry good faith claims handling standards to not perform a full, fair, thorough review with an insured's interests placed at least equally to its own.**

The file does not reflect that anyone from Northwestern Mutual contacted Highlands Behavioral Health to ensure the information from the intake forms was correct.  Northwestern Mutual did not contact Ms. Karen Townsend after seeing the notes from Highlands Behavioral Health to inquire as to any knowledge of cocaine usage.  Northwestern Mutual did not contact Mr. Townsend's providers to inquire as to cocaine usage at the age of 43, or any age.  Northwestern Mutual did not contact Mr. Townsend's therapist, Tupa, to inquire as to any cocaine usage.  Northwestern Mutual did not request any records from Sky Ridge, the facility where Mr. Townsend was first brought on October 14, 2018, prior to being transferred to Highlands Behavioral Health.

**A reasonable insurer with reasonable and properly trained claims personnel would have followed up on the validity of the information provided by Highlands Behavioral Health.  Specifically, the information provided in the intake notes from Highlands Behavioral Health could be interpreted in several different ways.  Instead of ensuring Mr. Townsend was given at least equal consideration, Northwestern Mutual chose to interpret the information pertaining to drug use in the least favorable manner to Mr. Townsend.  It is unreasonable for an insurer to interpret information in the least favorable manner possible of the insured especially after refusing to perform an investigation to ensure the validity of the information.**

Northwestern Mutual focused solely on the 1:30 am intake record from Highlands Behavioral Health to deny benefits.  At the time of the 1:30 am intake, Mr. Townsend had already been transferred from another facility where he had waited for several hours; had just made a suicide attempt; and admitted to having had 4 drinks in the past 24-48 hours.  Yet, Northwestern Mutual did not bother to request the records from Sky Ridge; did not bother to verify with Highlands Behavioral Health as to whether or not Mr. Townsend signed off on the accuracy of the intake record; and did not bother to check with Highlands Behavior Health as to Mr. Townsend's state of mind and accuracy of his statements.

While required to place the insured's (Mr. Townsend's) interests at least equally to those of its own, Northwestern Mutual did not comply with this obligation.  This is clear in the way Northwestern Mutual focused solely on the 1:30 am intake note from Highlands Behavioral Health and used it as the sole basis for rescinding coverage and denying benefits.  Had Mr. Townsend's interests been considered at least equally to those of Northwestern Mutual's, Northwestern Mutual would not have interpreted the intake note in the least favorable manner possible.

Specifically, the intake form and notations are not clear.  The form lists substance use of alcohol and cocaine.  Regarding cocaine, the form indicates use of 1 or 2 times only with last usage 3/18.  Giving equal consideration to Mr. Townsend, Northwestern Mutual certainly could have considered that Mr. Townsend tried cocaine 1-2 times only on March 18, 2018.  That would have made "age at 1st use" 44 and the notation of '43' by the intake specialist at Highlands Behavioral a mistake or miscalculation of age by either the intake specialist or Mr. Townsend himself.  Instead, Northwestern Mutual chose to treat the notation of "age of 1st use" "43" as fact despite the possibility of it not being true.  Specifically, it is not plausible that Mr. Townsend first used cocaine at age 43 if he used cocaine once or even twice in March 2018.  In March of 2018, at the time he admitted to "last" using cocaine, he was 44.

EXHIBIT F

Mr. Townsend could certainly have miscalculated his "age at 1st use".  A reasonable insurer and reasonably trained claims personnel would have taken into consideration that Mr. Townsend had been drinking; the interview was taking place late in night/early morning; the intake person could have been mistaken as to the exact "age of 1st use"; Mr. Townsend himself did not appear to have signed or attested to the information provided during the intake interview; the interviewer and/or Mr. Townsend could have miscalculated Mr. Townsend's age.

**However, Northwestern Mutual did not perform any further investigation into the validity of the information provided in the late night October 2018 interview and chose to interpret the information in the manner that would lead to denial of the claim.  Reasonable insurers who perform claims evaluations in accordance with industry standards diligently seek out information to support payment of the claim, not the opposite.  There is no logical or reasonable rationale for discontinuing its evaluation and denying benefits.**

Northwestern Mutual specifically chose to ignore certain pieces of information in order to deny the claim.  They ignored the possibility of Mr. Townsend's first and last use of cocaine was in March 2018 and instead determined that Mr. Townsend used cocaine definitively at age 43.  By using the most drastic interpretation possible, Northwestern Mutual was able to deny benefits and move the claim to rescission as opposed to payment.  Choosing to interpret conflicting documentation in the least favorable manner possible and that would have the most detrimental outcome on the claim speaks volumes as to where Northwestern Mutual's priorities and interests lay.

Had Mr. Townsend used cocaine 1-2 times at age 43, he could not possibly have used cocaine in March 2018, when he indicated that he "last used".  The fact is, Northwestern Mutual chose not to consider any other alternative other than Mr. Townsend definitively using cocaine at age 43.  Northwestern Mutual chose to rely on the scenario that would result in rescission of coverage and denial of the claim.  **Ignoring information and refusing to perform a full, fair, thorough review is not in compliance with industry good faith claims handling standards.  When one interpretation of the evidence supports paying a claim, a reasonable insurer should not choose an interpretation that results in denial of the claim.  When evidence is equally weighted in support of paying a claim and denying it, as was the case here with the intake form, the insurer places its interests above the insured's when it chooses to deny the claim.**

Upon receiving notification of Mr. Townsend's death in April 2019, Northwestern Mutual began investigating the circumstances of the claim, including the information provided by Mr. Townsend at the time of underwriting.  The investigation included speaking with Mrs. Townsend; speaking with Financial Representative Scott Van Sickle; performing a Driver Record Service Request; performing a media, internet and social media search of Mr. Townsend; obtaining Autopsy and Toxicology Reports; and review of Mr. Townsend's provider's (Dr. Larry Sanders) records.

Records from Highlands Behavioral Health were received on June 15, 2019.  The records from Highlands Behavioral Health indicated that Mr. Townsend had received an intake interview on October 15, 2018 after being transferred from Sky Ridge, another medical facility.  The Highlands Behavioral Health intake forms indicated that Mr. Townsend was being followed for a suicide attempt; had been drinking the day of October 14, 2018; had been transferred from another facility from earlier in the prior day (October 14, 2018); had a history of depression; had been taking Prilosec and Sertraline; and had been seeing a therapist named "Tupa".

19

EXHIBIT F

After receipt of the intake forms from Highlands Behavioral Health, Northwestern Mutual did not follow up on any of the information contained in those notes.  Specifically, prior to receiving the Highlands Behavioral Health intake notes, Northwestern Mutual had taken actions to verify the documentation provided at the time of underwriting.  However, notably absent from the claim file is any investigation or evaluation as to the validity of the information received from Highlands Behavioral Health.  It is clear that Northwestern Mutual stopped its evaluation once one piece of unverified information was received that supported the conclusion that Mr. Townsend lied on the application, even though that one piece of information differed from all the other information Northwestern Mutual had received and reviewed.  Instead of choosing an interpretation of that information that would indicate Mr. Townsend accurately answered question 4c on the MHQ and also answered the intake questions accurately, Northwestern chose to believe the interpretation that Mr. Townsend lied.

The claim file clearly demonstrates that after receiving the Highlands Behavioral Health intake notes, Northwestern Mutual did not pursue avenues to diligently seek out information in support of payment of the claim.  In fact, instead of taking actions to verify the accuracy of the information provided in the Highlands Behavior Health notes, Northwestern Mutual chose to reach out to the Financial Representative Scott Van Sickle, to ask him about the interview and applications taken in 2017.  A reasonable insurer, with an eye toward payment of the claim, would have also taken actions to verify the information provided during the October 2018 Highlands Behavioral Health intake process.  Actions could have included contacting Ms. Townsend again to inquire about Darren's drug use; contacting Highlands Behavioral Health to verify the information provided in the intake notes; contacted Darren's prior therapist, Tupa; and/or requested notes from Sky Ridge, the facility where Mr. Townsend had been prior to Highlands Behavioral Health.

**Had Mr. Townsend's interests been placed at least equally to those of Northwestern Mutual's, it would have taken the steps to diligently seek out information to clarify, and ensure the validity of, the very information that it was using to make a claim determination.   Specifically, Northwestern Mutual could have demonstrated its intent and obligation to give the Townsends equal consideration by also following up with the interviewer from Highlands Behavior Health.  A reasonable insurer with appropriately trained claims personnel would have conducted a full, fair, claims evaluation.**

The claim file clearly outlines how Northwestern Mutual chose to investigate Mr. Townsend's eligibility for benefits with an eye toward denial not approval.  The claim file demonstrates how Northwestern Mutual performed its evaluation for eligibility for benefits until such time as a piece of information was received that could lead to a denial of benefits.  Specifically, upon receiving the Highlands Behavioral Health notes, Northwestern Mutual stopped its investigation altogether and used the information to the detriment of the claimant.  There was no follow up investigation or clarification of the information received.  The information pertaining to cocaine use was interpreted in the way most favorable to Northwestern Mutual and made denying the claim possible, placing Mrs. Townsend's interests as an insured and claim beneficiary beneath those of Northwestern Mutual's.  This is not in compliance with industry good faith claims handling standards.

**An insurance company who places insureds' interests below its own is not in compliance with industry good faith claims handling standards.  Failing to thoroughly, fairly and reasonable evaluate eligibility for benefits is in violation of industry good faith claims handling standards.**

20

EXHIBIT F

It is clear that Northwestern Mutual ignored other aspects of the intake process including that he had been transferred from Sky Ridge, had alcohol in his system, had just attempted suicide, had not likely had any rest for several hours that could plausibly have led to him to misremember or miscalculate his age, and/or failed to account for the possibility that the intake specialist could have miscalculated Mr. Townsend's age.

Not only did Northwestern Mutual construe the documentation in its own favor but chose to perform no investigation whatsoever into the one piece of information that it ultimately relied on.   For example, Justine Strupp specifically stated "NB needs to review due to cocaine use so they will address whether or not they want records, however, depression history was accepted at UW" (NORTHWESTERN0285). Yet, absolutely no follow up investigation took place after receiving and reviewing the Highlands Behavioral Health note of October 15, 2018.  No one from Northwestern Mutual requested additional clarifying medical records; no one questioned the validity of the information on the intake forms; and no one from Northwestern Mutual considered the fact that it denied coverage and benefits to the Townsends based on information that no one actually knew whether Mr. Townsend attested to it.  Mr. Townsend did not sign the intake forms nor was the information provided in the intake notes verified by anyone; yet, Northwestern Mutual chose to rely on unsubstantiated, conflicting information in order to rescind coverage and deny benefits.

Based on the information in the file, on June 20, 2019, after reviewing the October 15-16, 2018 Highland Behavior Health records, Justine Strupp indicated that Mr. Townsend had seen an outside therapist named "Tupa" and that "NB" needed to review the file and address whether or not they wanted records.

However, after Ms. Strupp's June 20, 2019 summary of the Highlands Behavioral Health notes, the file was reviewed by Melissa Guidinger, Monica Esch, and Chris Amidzich.  There is no indication that any additional clarification was sought by anyone as to the discrepancies in the intake notes.  No additional records were requested and no inquiries were made to ensure Mr. Townsend's eligibility for benefits was afforded every consideration.  Instead, Northwestern Mutual discontinued its investigation and denied coverage and benefits.

The claim file is clear that "NB" (New Business) determined that they did not want records to attempt to clarify the inconsistencies noted on the intake form.  Instead, Northwestern Mutual chose not to request any records, not conduct any additional interviews, and not seek any clarification so that the claim could be denied.  Any follow up investigation that took place could have led to approval and payment of the claim.  Northwestern Mutual has demonstrated that it had no intent on investigating the claim with an eye toward payment, as is industry standard.  Instead, Northwestern Mutual focused on denying the claim and rescinding coverage after an incomplete, unfair, inaccurate evaluation.

**A reasonable insurer, and its' staff, would have questioned the veracity of the information provided in the intake notes.  At a minimum, the information noted in the October 2018 intake forms pertaining to cocaine use was inconsistent with all other information Northwestern Mutual had to date.  Based on the circumstances of when the information had been gathered (late at night; post suicide attempt; alcohol involvement; transferred from another facility; unclear state of mind; incomplete forms), it is reasonable to question the validity of the information on the forms.  However, Northwestern Mutual ignored the scenarios that would support payment of the claim and instead chose to favor itself.**

21

EXHIBIT F

**Ignoring documentation; failing to complete a full, fair, thorough review; and placing its own interests above those of the insured are not in compliance with industry good faith claims handling standards.**

In addition to the claim file, the April 22, 2021 deposition of Justine Strupp was reviewed.  Justine Strupp is the claims specialist who handled Mr. Townsend's claim.  Ms. Strupp stated that she had been with Northwestern Mutual for 27 years.  She indicated that he did not actually read the medical records contained in Mr. Townsend's claim file before making her recommendation to deny the claim and rescind coverage.  She relied on Cindy Snoda's (a retiree) review of the medical records. Ms. Strupp further stated that her director at the time, Chris Amidzich made the final decision as to the denial and rescission.  She further stated that a meeting took place prior to the denial/rescission decision between herself, Ms. Snoda, and Mr. Amidzich; however the content of the meeting was not summarized or documented in the claim file as it is not Northwestern Mutual's practice to do so.

Ms. Strupp also indicated that she made no determination as to whether or not Mr. Townsend intentionally misled or misrepresented his cocaine use at the time of underwriting. She stated that the denial/rescission decision was based solely on the one piece of information from Highland Behavioral and that she assumed that since the note from Highland stated that Mr. Townsend used cocaine at age 43, it was a fact.  Ms. Strupp stated that it was not part of Northwestern Mutual's practice to follow up for additional clarifying information from a deceased's spouse.

Ms. Strupp was asked the following:  "And if there are doubts on the – with respect to whether or not a claim is payable or not, do you need to side with the insured as opposed to the insurance company in resolving those doubts?"  She replied with "Yes".

When asked about the Unfair Claims Settlement Practices Act, Ms. Strupp stated that it wasn't something that she was very familiar with.

Melissa Guidinger was deposed on April 23, 2021.  She indicated that she had been with Northwestern Mutual for 31 years.  At the time of the deposition, Ms. Guidinger indicated that she was a Life Technical Underwriting Consultant. She indicated that she relies on the drug section of the underwriting manual/underwriting standards when issues arise as to illegal drug use.  Ms. Guidinger further indicated the following:  "We don't veer from our guidelines when it comes to drug use."  She indicated that she felt everything she did on Mr. Townsend's claim was correct; there was nothing more that she could have done; and that her actions were deliberate.  Ms. Guidinger acknowledged that if Mr. Townsend had not used cocaine at age 43, then her determination would also have been incorrect.

Cindy Snoda was deposed on May 14, 2021.  She indicated that she was working for Northwestern Mutual through MBO Partners and had previously worked directly for Northwestern Mutual for 30 years. Ms. Snoda indicated that Northwestern Mutual assumes that the information in the medical records is accurate and that it is not routine protocol to contact medical providers for clarification of medical records. Ms. Snoda indicated that Ms. Townsend was not questioned or contacted about Mr. Townsend's cocaine use as it was not Northwestern Mutual's process to contact family members or beneficiaries.  Ms. Snoda acknowledged that the agent was contacted for clarification as to the information provided at the time of application but no one else was contacted for verification or clarification.  Ms. Snoda also acknowledged that Northwestern Mutual knew that Mr. Townsend had been seen at Sky Ridge in October 2018 prior to being transferred to Highlands Behavior and had been seeing a counselor ("Tupa"); yet, no one from Northwestern Mutual requested any records and/or

EXHIBIT F

sought clarification from those sources.   She indicated that Northwestern Mutual's handling of the claim was consistent with its customs and practices.

Mr. Christopher Amidzich was deposed on May 26, 2021.  He indicated that he had been with Northwestern Mutual for almost 22 years.  His current position was as a Senior Director within Policy Benefits.  Mr. Amidzich indicated that it was company protocol to accept whatever was in the medical record as true and that he did not feel it was necessary to follow up with Highlands Behavioral to verify where the information from the October 2018 intake form came from.  He further indicated that Northwestern Mutual decided that it was a fact that Mr. Townsend used cocaine within one year of the Mental Health Questionnaire being filled out but that no one took any steps to verify the information from the October 2018 Highlands Behavioral intake form.  Mr. Amidzich indicated that he was not aware who took the interview/information at the time of the completion of the Mental Health Questionnaire and did not know whether or not any investigation into the completion of the MHQ could have or should have taken place at the time of the claim.  Mr. Amidzich stated that his actions on Mr. Townsend's claim were deliberate and that it was an absolute fact that Mr. Townsend used cocaine at age 43.

Mr. Jeremiah Repinski was deposed on June 10, 2021.  Mr. Repinski indicated that he worked at Highlands Behavioral Health as an intake professional.  He indicated that he was working at the time of Mr. Townsend's admission in October 2018.  When asked about why certain boxes were not checked and/or sections of the intake form were not completed, Mr. Repinski stated the following (Repinski deposition - Page 50):

> Because I must have been sloppy and didn't check both boxes. I also noticed when I was reviewing this form, I didn't complete the mental status exam. And so I may have been tired. I don't remember exactly why I didn't check it, but during a chart audit, I would have gotten in trouble. So --

**The October 2018 intake interviewer, Mr. Repinski, stated himself that he "must have been sloppy" and that he "didn't complete the mental status exam".  Had Northwestern Mutual followed up on the validity of the information noted in the October 2018 intake interview, it likely would have realized that the interview was incomplete and inaccurate and that there was reason to question the accuracy of the answer about Mr. Townsend's "age of 1st use."**

When asked if there were any inconsistencies in what he wrote down in the intake forms regarding Mr. Townsend's age of first use and last use of cocaine, Mr. Repinski indicated the following (Repinski deposition – Pages 56-57):

> Again, I don't know his date of birth and how old he was at the time of the evaluation or what his age would have been in March of 2018. So I don't know if that matches up or not.

> Actually, backing up a step on -- can I back up a step, too? Because age of first use may have been different than the age of last use, and so I don't know for sure if his first and last use were the same time period. So as far as inconsistencies, I don't know if he first tried cocaine at 43, and the last time he used it was March of 2018.

When asked about the accuracy or inaccuracy of the information provided by patients during the intake process, Mr. Repinski responded with the following:

EXHIBIT F

Yeah. That's frequently the case, especially at this hour of the night. It would have been late at night, 1:30ish, probably around 2:00 o'clock when I was asking these questions, 2:15ish. He was probably tired. A lot of times people are tired. They just want to get this done with and over with as quickly as possible, and so they're -- you know, there's all sorts of reasons why you might not get the most accurate information at the time of the evaluation, especially on an overnight shift.

**The deposition testimony of Mr. Repinski only solidifies that Northwestern Mutual did not act reasonably in solely relying on the intake notes as absolute fact. He stated himself that there were reasons to challenge the validity of the information; he was sloppy; he did not complete all the questions; and that he did not complete a mental status examination. A reasonable insurer would have thoroughly evaluated all the information with an eye toward payment, not denial.**

Chapter 304.2:  Drug Abuse (NORTHWESTERN 1597-1607) of Northwestern Mutual's Life Underwriting Manual was also reviewed.  This section of the Life Underwriting Manual is separated into the following sections:

*Introduction*
*Mortality*
*Drug Abuse Treatment*
*Definitions*
*Underwriting Considerations*
*Ratings*
*Marijuana Reconsideration*
*Special Procedures*
*Helpful Websites Including a Comprehensive List of Drugs of Abuse, Drug Terminology, and Acronyms*
*Sources*


The Drug Abuse section of Northwestern Mutual's Underwriting Manual outlines how drug use, drug abuse and drug abuse treatment are taken into consideration from an underwriting perspective, at the time of underwriting.  Specifically, the Drug Abuse section pertains to how and/or if an applied-for life insurance policy would be issued.  As the name implies, this section of the Life Underwriting Manual applies to underwriting considerations and does not appear to apply to claims handling procedures and processes.

Life Benefits Division:  Contestable Manual (NORTHWESTERN 1608-1731) and CONTESTABLE REVIEW 9/20/2018 (NORTHWESTERN 1732-1759) documents were also reviewed.  These documents pertain to Northwestern Mutual's handling of a claim if submitted during the contestable period and indicates the following, in part:

*A policy is contestable for two years from its date of issue, unless the Insured dies during the two-year period, in which case the policy remains contestable indefinitely. Whenever life insurance is applied for, the Company asks for a variety of information about the Insured's health, driving record, etc., that New Business relies on to establish insurability. If, during that time, the Company becomes aware of material misrepresentations, it has the right in most states to rescind the policy and deny the claim. Material misrepresentations may be discovered not only in the claim process but also in the underwriting process.*

24

EXHIBIT F

*While underwriting additional insurance, New Business may discover misrepresentations in the application of an already issued, still contestable policy. These cases are sent to Life Benefits for handling as a non claim (see section on Rescissions & Reformations).*

The document outlines the procedures for the claims department to follow when handling a claim submitted on a contestable policy.  As indicated in the depositions of Ms. Strupp, Ms. Snoda, Ms. Guidinger, and Mr. Amidzich, it is not part of Northwestern Mutual's process to contact a beneficiary or provider to verify or clarify any conflicting or potential discrepancies discovered during the contestable review.  Neither the 'Contestable Manual' nor the 'Contestable Review' outline, suggest or recommend that claims personnel verify the validity of information obtained as part of the contestable review.

**A reasonable insurer would have procedures in place to fully investigate and evaluate information with an eye toward payment.  An insured should not be compelled to file a lawsuit in order to recover benefits.  It is inappropriate and not in compliance with industry good faith claims handling standards to deny a claim without fully and fairly reviewing all documentation.  There is no logical or reasonable explanation for Northwestern Mutual's lack of processes and procedures to ensure a full, fair, equitable claims review.**

After reviewing the deposition testimony of individuals involved with Mr. Townsend's claim, my opinions as to Northwestern Mutual's mishandling of his claim are only solidified.  Specifically, as the underwriting documents support, Mr. Townsend was issued an Individual Term Life Policy as of September 20, 2017 and a Survivorship Whole Life Policy as of October 20, 2017.  As previously indicated, the policies were issued, in part, based on information provided by Mr. Townsend in signed documents dated June 6, 2017; August 16, 2017; and September 20, 2017.  In addition to the documents signed and attested to by Mr. Townsend, medical records were obtained, a paramedical examination took place, and a Client History Interview took place.

A claim was filed in April 2019, after the death of Mr. Townsend.  As the death occurred within two years of the policy issue dates, a contestable evaluation took place.  The claim file documentation, and deposition testimony of Northwestern Mutual staff, indicates that benefits were denied and the policies were rescinded based solely on information from an intake form from October 2018 from Highlands Behavioral Health.

Upon reviewing the intake form from October 15 -16, 2018, the only piece of information mentioning cocaine use and from which Northwestern Mutual used as the sole basis of denying benefits and rescinding coverage, it is obvious that further evaluation needed to take place.  Yet, although obligated to perform a full, fair, thorough review with an insured's interest placed **at least equal** to those of itself, Northwestern Mutual took no action to clarify or verify the one piece of information on which it was basing its denial decision.  Had Mr. Townsend's interests been considered at least equally to those of Northwestern Mutual's, the insurer would have taken the steps necessary to ensure the validity and accuracy of the information on which they were relying.

Northwestern Mutual required that Mr. Townsend sign and authorize his full health history at the time of underwriting; yet, at the time of claim, Northwestern Mutual relied on information that may, or may not, have come from Mr. Townsend himself.  In addition, the information on the Highlands Behavioral Health Forms were inconsistent and unclear.  In fact, the intake person himself, Mr. Repinski, stated in his deposition that the intake interview took place late at night and that there were many reasons why a

25

EXHIBIT F

person may give inaccurate information, especially on an overnight shift.  Mr. Repinski further stated that he, himself, may have been tired, must have been sloppy, and did not conduct the mental status examination as he should have.  Mr. Repinski has indicated that the age "43" of Mr. Townsend's first use of cocaine may not be accurate for several reasons.  This is the one piece of information that Northwestern Mutual used to rescind coverage and deny benefits.  Northwestern Mutual chose to discontinue its investigation and deny benefits instead of diligently pursuing documentation in support of the claim.

**Northwestern Mutual refuses to pay any benefits even though it knows that the information it based its rescission and denial on, may not be accurate.  Instead of placing Mr. Townsend's interests at least equally to those of itself, Northwestern Mutual placed its interests above those of Mr. Townsend and chose to view the information in its own favor.  Misconstruing information; failing to complete a full, fair, thorough review; and placing its own interests above those of the insured are violations of industry good faith claims handling practices and procedures**.

To summarize, Northwestern Mutual chose to contact the agent, Mr. Scott Van Sickle, as part of the contestable evaluation, to question him about the validity of the interview taken at the time of underwriting to determine whether or not there was reason to question the answer Mr. Townsend gave to question 4c.  However, absent from the contestable evaluation, is any attempt whatsoever to contact anyone or any facility to verify the validity of the same piece of information in the October 2018 intake form.

An equitable, fair, complete claim eligibility evaluation would consist of evaluating the information provided at the time of underwriting with at least equal weight to the information provided at the time of claim.  Northwestern Mutual specifically chose to only contact the issuing agent, at the time of claim, to question him about the underwriting interview taken in August 2017; yet, completely disregarded any attempt to verify the October 2018 Highlands Behavioral Health intake forms and did not bother to take the time or initiative to ensure any and all questions were resolved.  Instead, Northwestern Mutual viewed the discrepancies in favor of itself and carelessly viewed the Highlands Behavioral Health information as "fact" in order to deny coverage and benefits.

**Northwestern Mutual's own staff stated in deposition testimony that no one verified or questioned the conflicting information at the time of claim.   There is no reasonable explanation for the lack of evaluation and actions steps towards payment after receiving the Highlands Behavioral Health intake notes.  Refusing to perform a full, fair, thorough evaluation is not in compliance with industry good faith claims handling practices.  The claim file, coupled with the deposition testimony of Northwestern Mutual's employees and its internal manuals, demonstrate the carrier's lack of compliance with industry good faith claims handling standards.**

EXHIBIT F

## Conclusion

Darren Townsend was issued Individual Term Life Policy 22219582 on September 20, 2017 and Survivorship Whole Life Policy as of October 20, 2017.  At the time of application in 2017, Mr. Townsend took part in interviews, a medical examination, and completed applications including revealing his medical and psychiatric history.

Ms. Karen Townsend, Darren's wife, filed a claim for benefits after his death in April 2019.  As the policies had been in force for less than 2 years, a contestable evaluation took place.  Taking into consideration Mr. Townsend's disclosure of his psychiatric treatment and condition at the time of underwriting in 2017, Northwestern Mutual did not indicate any concerns, from a psychiatric perspective, as to the validity of the information provided at the time of underwriting.

However, upon receiving a notation in an intake interview from Mr. Townsend's October 2018 admission to Highlands Behavioral Health mentioning cocaine usage at the age of 43, Northwestern Mutual rescinded coverage and denied benefits.  The claim file demonstrates that Northwestern Mutual took that one mention of cocaine usage at the age of 43 and used it as the sole reason for rescinding coverage and denying all benefits.

Northwestern Mutual disregarded all other information that supported that Mr. Townsend had not used cocaine in the 10 years prior to the application for coverage and assumed that the information supposedly provided by Mr. Townsend about when he first tried cocaine in the late-night, post-suicide attempt, post-intoxication, sleep-deprived interview must be fact.  Again, all other information received by Northwestern Mutual up until the June 15, 2019 receipt of the Highlands Behavioral Health notes supported that Mr. Townsend had been truthful in accurately disclosing his medical, psychiatric and drug history.  However, based on the information in the claim file, Northwestern Mutual took one notation in the October 2018 intake interview as fact, without any verification or clarification in spite of numerous red flags about whether his supposed statement was accurate (because it was possible, according to Mr. Repinski, that the statements may not have been accurate) and used it to rescind coverage and deny benefits.  It is clear from the claim file that Northwestern Mutual did not take any action to verify the validity of the October 2018 intake notes.  Instead, it disregarded all other information and placed all the emphasis on one late-night, post-suicide intake interview.

The actions taken by Northwestern Mutual benefited only Northwestern Mutual.  Mrs. Townsend's interests were not considered equally and they were not afforded a full, fair, thorough review in accordance with industry good faith claims handling standards.

Northwestern Mutual knowingly chose to discontinue its investigation and use information that the company should have known was of questionable veracity to the detriment of the Townsends.  Northwestern Mutual ignored industry standards and chose to place its own interests above those of the Townsends'.  Their actions in the claim violated numerous industry claims handling standards including:

- **Knowingly misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverage at issue.**
- **Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies.**

27

EXHIBIT F

- **Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear.**
- **Refusing to pay claims without conducting a reasonable investigation.**

Industry and state claims handling standards and regulations are in place to ensure claimants and policyholders are afforded a full, fair, thorough review.  Mr. Townsend's claim file demonstrates his interests were not placed at least equally to those of Northwestern Mutual's.  The documentation in the claim file supports that Mr. Townsend was treated unfairly and unreasonably.

The opinions in this report are based on my review of the claim file documents provided by Levin Sitcoff PC and my education, background, training and experience.  In addition, opinions are based on insurance industry specific documentation including, but not limited to, information from the National Association of Insurance Commissioners, Market Conduct Examinations, International Claims Association, state specific insurance regulations, insurance conferences, and insurance company claims manuals, policies and procedures.

This report is based on the documentation reviewed as of the date of this report.  Should additional documentation become available for review, this report may be supplemented to include additional analysis, conclusions and opinions.

Per 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is a true and correct copy of my report.  Executed on August 9, 2021.

Respectfully submitted,

Laura B Parker, CLU®, ChSNC®, CDMS
Independent Disability Consultant
Seacoast Benefits LLC

28

EXHIBIT F

# Laura B Parker

**29 Creekview Drive, Eliot ME 03903 – (207) 703-6820 – lparker@seacoastbenefits.net**

## Professional Experience

**Seacoast Benefits LLC – Eliot ME**                                                September 2015 to present
**Owner/Disability Claims Consultant**
- President of claims management consulting firm specializing in the complexities of disability insurance.
- Provider of independent, expert disability claim file opinions, audits and reviews.

**Salt Associates – Yarmouth ME**                                                December 2012 to September 2015
**Disability Claims/Appeals**
- Managed client companies' complex disability claim appeals including audits of policies, procedures and overall appeals handling processes.
- Responsible for adjudicating all aspects of Non-Binding/Third Party Mediation Process.
- Developed and implemented Quality Assurance programs and processes for clients.
- Performed disability claims organization audits for client companies.

**DRMS – Westbrook ME**                                                April 2000 to November 2012
**Disability Claims/Appeals**
- Created and implemented all processes and procedures for Association Claims Unit.
- Client visits to discuss and implement claims adjudication processes.
- Managed team of direct reports – STD, LTD, Association Disability claims analysts.
- Administered all aspects of complex ERISA and non-ERISA appeals.
- Developed and implemented disability claims Quality Assurance program.

**UNUM – Portland ME**                                                May 1996 to April 2000
**Individual Disability Complex Claims**
- Adjudicated Individual Disability claims as part of Complex Claims Unit.
- Administered and handled all aspects of Individual Disability claims as part of Complex Claims Unit.
- Mentored, trained, and supervised Individual Disability Appeals team.

**Chubb Life America – Concord NH**                                                April 1994 to May 1996
**Individual Disability Claims**
- Adjudicated all aspects of complex Individual Disability Claims.
- Performed field visits and claimant interviews.
- Developed and implemented disability claims internship program.

## Education

**MBA - University of Southern New Hampshire – Business Administration**         May 2001
**BS - University of New Hampshire – Business Administration**         May 1992

## Professional Designations/Licenses

Chartered Life Underwriter – CLU®; Chartered Special Needs Consultant - ChSNC®
ALHC; HIA; ACS; FLMI; CDMS
Maine:  Licensed Life & Health Consultant; Life and Health Producer; Property and Casualty Adjuster
New Hampshire:  Accident, Life & Health Producer
New York:  Independent Adjuster – Accident and Health

EXHIBIT F

## Sources/Research Reviewed

Appleton, Jo Ann S., and Charles H. Cissley. *Claim Administration: Principles and Practices*. Atlanta, GA: International Claim Association, 1989. Print.

"Home." *International Claim Association*. Web.

Hoopes, Doris. *The Claims Environment*. Malvern, PA: Insurance Institute of America, 2000. Print.

Lynch, Kevin M., Glenn E. Jr. Stevick.  *Fundamentals of Insurance Planning*. Bryn Mawr, PA: American College, 2015. Print.

Markham, James J., Kevin M. Quinley, and Layne S. Thompson. *The Claims Environment*. Malvern, PA: Insurance Institute of America, 1993. Print.

"National Association of Insurance Commissioners (NAIC)." *National Association of Insurance Commissioners (NAIC)*.Web.

Popow, Donna J. *Claim Handling Principles and Practices*. PA:  The Institutes, 2012. Print.

EXHIBIT F

## Document List

NORTHWESTERN 0001-1759
SVS 0001-0267
Complaint
Answer and Jury Demand
Protective Order


Depositions:
Justine Strupp
Karen Townsend
Melissa Guidinger
Christopher Amidzich
Cindy Snoda
Dr. David Charles Holland
Carmen Merwin
Jeremiah Repinski

31
EXHIBIT F

## Expert Deposition Testimony

*Roth v New York Life Insurance Company* – California – December 2016

*Chang v Mass Mutual Life Insurance Company* – California – November 2017

*Wall v Canada Life Assurance Company* – California – February 2019

*Melson v Unum* – Alabama – May 2019

*Cheney v Unum* – Ohio – July 2019

*Young v Prudential* – Pennsylvania – October 2019

*Cluck v Unum* – Ohio – December 2019

*Shenon v New York Life Insurance Company* – California – December 2019

*Lemons v Principal Life Insurance Company* – Alabama – April 2020

*Muetzel v Unum* – Ohio – February 2021

*Plaia v Unum* – Colorado – April 2021

*Hegwer v MassMutual* – Montana – May 2021

*Carney v Anthem* – Colorado – June 2021

*Kelpe v Unum* – California – July 2021

32

EXHIBIT F