ROUGH DRAFT DISCLAIMER

DEPOSITION OF:  LAURA PARKER

DATE:  September 29, 2021

DISCLAIMER: This rough draft text is roughly edited, uncertified, and may contain untranslated words, a note made by the reporter, a misspelled proper name, and/or word combinations that do not make sense.  All such entries will be corrected on the final certified transcript which we will deliver to you in accordance with our customary/your requested delivery arrangements.

Due to the need to correct entries prior to certification, this rough draft is to be used only for the purposes of augmenting counsel's notes and cannot be used or cited in any court proceedings or to distribute to other parties to the case who have not purchased a transcript copy.

CONSENT: By opting for this rough draft service, you have agreed: (1) To purchase the transcript at the customary/agreed-upon rate; (2) Not to furnish this transcript, either in whole or in part, on disk or hard copy, via modem or computer, or by any other means, to any party or counsel to the case.

EXHIBIT H

what the next number is.

THE COURT REPORTER:  It will be Exhibit 57.

MR. SANDS:  Thank you.

(Exhibit 57 was marked.)

Q.   (By Mr. Sands) And like I said, Ms. Parker, I'm not trying to conduct a memory test here of -- of your

44

report.  So anytime you need to refer to it, please feel free to do that.  We'll have it up in -- in a moment.

And I want to refer to something you said in your report, and I'm going to probably end up bouncing around as we go through this deposition process.  On page 22 of -- of your report, you state -- you said that Northwestern -- you said -- well, you say, "Ignoring documentation."  Do you see what I'm talking about --

A.   No.

Q.   -- at the very top?

What documentation are you saying Northwestern involved in the Townsend matter?

A.   Can you just -- you're talking about that first -- very first paragraph, "It is clear"?

Q.   No.  On page 22 there's a bold font lead-in clause that says, "Ignoring documentation."  Do you see

EXHIBIT H

that?

A.    Okay.

Q.    As you sit here right now, do you recall what documents you're referring to when you say -- or infer that Northwestern Mutual ignored documentation?

A.    Sure.  What I'm referring to is Northwestern Mutual ignoring information that they knew existed and didn't go out and seek that information to help them further their investigation.

45

That documentation would have been -- they -- they knew that the claimant -- or Darren Townsend had seen a therapist called Tupa.  They did not go out and get those records.  They knew that Darren Townsend, when he was admitted to Highland Behavioral Health, had been transferred from another facility called Sky Ridge.  They did not go out and get those records.

Q.    Anything else?  When I say "anything else," I mean that you would characterize as documentation that was ignored by Northwestern Mutual.

A.    Well, they also ignored the opportunity to go out and get documentation from Darren's prior coworkers, from his wife, from his physicians, and

EXHIBIT H

documentation already existed prior to receiving the information from Highland Behavioral that supported payment of the claim.

Q.    Let me break that down.  What specific documents are you aware of that existed involving coworkers, as you just said?

A.    Right.  That's -- that's the point is that they could have gone out and interviewed prior coworkers to obtain additional information.

Q.    Ma'am, I'm asking you a more specific question.  You said that Northwestern Mutual ignored documentation from Mr. Townsend's coworkers.  I'm asking

46

you to identify the documentation to which you make reference in your report.

MS. RUGH:  Objection, form.  Objection.  It misstates prior testimony.

Q.    (By Mr. Sands) Well, let's just ask it again.  Please identify for us the specific documents you were referring to when you just said a moment ago documents that Northwestern did not get from coworkers.  What specific documents are you referring to?

MS. RUGH:  Same objections.

EXHIBIT H

A.    I believe I had said documentation meaning information or interviews.  I don't know if there was additional specific paper documentation out there from coworkers because it was not obtained.  What I'm saying is that they knew where Darren had worked.  They knew that they could get in touch with coworkers, and they chose not to go get information that -- that could have existed.

Q.    (By Mr. Sands) What -- what specific information -- please identify for us the specific information you are referring to when you say that.

A.    Again, we don't know what the specific information from the coworkers or prior employees could have been because it wasn't obtained, but it's something that the employees could have provided information about Darren's state of mind, his activities, whether they could

47

verify the information or assist with verifying the information on the application, and also the information from the October 2018 hospitalization.

Q.    Have you investigated what information that falls into that category you just described is out there?

MS. RUGH:  Object to form.

A.    I have not.

EXHIBIT H

Q.    (By Mr. Sands) Do you understand my question, ma'am?  You're being critical of an insurance company for not getting documentation.  I'm asking you to identify specifically the documents.  There aren't any, correct, that you know of?

MS. RUGH:  Object to form.

A.    I don't know.

Q.    (By Mr. Sands) And, yet, you're being critical of the company for not getting documentation you don't even know exists, ma'am, correct?

MS. RUGH:  Object to form.

A.    I had identified some documentation that the company knew existed, and I also added on information that they could have obtained.

Q.    (By Mr. Sands) Well, the only things you've identified specifically are Therapist Tupa's records and Sky Ridge records, correct?

A.    Correct.  And they also could have obtained

48

additional information from Highlands Behavioral as to the intake process and the forms.

Q.    What sort of information are you talking about there?  You mean internal Highlands Behavioral

EXHIBIT H

Health processes?

A.    No, not necessarily.

Q.    What are you referring to then?

A.    I'm referring to that they could have spoken to the intake people and clarified what happened on the night of the interview, the night of the intake.  They could have asked for more information about how about the questions were asked, what the claimant's frame of mind was.  They could have clarified whether the information that Highlands Behavioral had was simply transferred from Sky Ridge or if the interview actually took place.  They also --

Q.    You're not talking about --

A.    I wasn't finished.

Q.    I'm sorry.  Go ahead.  Go ahead.

A.    They could have also asked if the claimant, Darren, signed off on the information from the intake form.  They could have asked who else was in the room with him at Sky Ridge and who asked the questions, in what manner.  So there could have been additional investigation regarding both Sky Ridge and Highland Behavioral.

49

Q.    Let me break that down.  What information

is it you are specifically saying Northwestern Mutual would have obtained had it done those things?  The specific information, ma'am, not -- not your speculation, but specifically what are you being critical of Northwestern Mutual for not getting by doing the things you just identified?

A.   Had they gotten the records from the therapist, Tupa, that they knew about, I don't know what that -- if it's several pages of paperwork, if it's paperwork, but they could have obtained information from Tupa.

Q.   No.  I'm not asking you what they could have done.  I'm asking you what specific information you know about Northwestern Mutual did not obtain, not whether they might have tried, what information they specifically would have obtained had they done the things you just said they -- you think they could have done.

MS. RUGH:  Object to form.

A.   And I've -- I've already answered this. They -- information from Tupa that they knew about and also information from Sky Ridge that they knew about.

Q.   (By Mr. Sands) Had they gotten the Tupa records, what would they have learned?  What would have Northwestern Mutual have learned had they had the Tupa

50

EXHIBIT H

records?

A.   We don't know because they didn't obtain them.

Q.   Have you seen them?

A.   I don't recall.

Q.   You don't know whether you've seen the Tupa records?

A.   I said I don't recall whether I've seen the Tupa records.

Q.   Well -- but you don't know if there was something in the Tupa records that Northwestern Mutual would have obtained that would be relevant here.  You don't know, do you?

A.   We don't know because they didn't obtain it.

Q.   Well, then -- and were those records provided to you by the Townsends' attorneys before you wrote your report?

A.   I don't recall.  If you could scroll to the end where the document list is, I could take a look.

Q.   Well, wouldn't -- if you're going to be critical of Northwestern Mutual for not obtaining those records, don't you think it would be prudent for you first

EXHIBIT H

to know what's in those records as an expert witness?

A.    I didn't make the decision on the claim.

51

Northwestern Mutual made the decision on the claim.

Q.    Do you not understand my question, ma'am? Let me ask it again.    If you're going to come into this lawsuit and represent yourself as an expert witness and one of your criticisms is that Northwestern Mutual didn't get the Tupa records, wouldn't it be important for you to know what's in the Tupa records before you level criticism at Northwestern Mutual?

A.    No.

Q.    Why not?

A.    Because it was Northwestern Mutual's responsibility as the -- as the claims department to obtain those records to -- to further the claim toward payment.    There was no reason not to obtain them.    If anything, the records from Tupa would have either further verified their decision or moved the claim towards payment.

Q.    So as an expert witness, you don't know one way or another, correct?

MS. RUGH:    Object to form.

A.   I have -- I haven't gotten to the document list to see if -- if I reviewed those records.

Q.   (By Mr. Sands) Well, why don't you go ahead and do that?  It's on page 31 of your report.

A.   Okay.  I'm not controlling the scrolling of

52

the --

MR. NELSON:  This report ends at 28.  Is there another exhibit I should introduce?

MR. SANDS:  Well, no.  It's part of her report.  So I don't -- let's -- let's not take the time to do that right now.

Q.   (By Mr. Sands) As you -- just to be clear about this, as you sit here right now, you don't know whether you've seen the Tupa records, right?

A.   I don't recall whether I've seen the Tupa records.

Q.   And you don't -- you can't tell us what is in those records, correct?

A.   Correct.  Because I don't recall if I've -- if I've seen the records.

Q.   If you had seen something in the Tupa records that you believed was relevant here, you would

EXHIBIT H

have put it in your report, wouldn't you?

MS. RUGH: Object to form.

A. I don't know. Most likely I would have.

Q. (By Mr. Sands) Are you aware -- were you made aware by the attorneys who hired you in this case that we had, in this lawsuit, asked for the Tupa records; but they came primarily redacted? Do you know what that means?

53

A. Yes.

Q. And so my question really is have you seen the Tupa records unredacted, and you're saying you don't recall, right?

A. I've said that several times, yes. I don't recall whether I have seen Tupa's records.

Q. You have and I apologize for the repetition but I wanted to be clear. You haven't seen them unredacted or at least you don't recall.

Can you check your file to see if you have the Tupa records before we finish this deposition?

A. Sure. I could -- I can try that.

Q. Do you understand, ma'am, as an expert witness that you need to be able to describe, among other

EXHIBIT H

things, everything you looked at, right?

A.   Correct.

MS. RUGH:   Object to form.

Q.   (By Mr. Sands) And as an expert witness you need to be able to describe your methodology in reaching your opinions, correct?

A.   Correct.

Q.   But your methodology in this case didn't involve seeing what's in the documents you're critical of Northwestern for not obtaining, right?

MS. RUGH:   Object to form.

54

A.   No.   I'm -- I'm critical of them for not obtaining the Sky Ridge records and the records from Tupa. I said I didn't recall whether I've seen the records from Tupa.   I have received and reviewed the records from Sky Ridge.

Q.   (By Mr. Sands) So at least your methodology, in part, doesn't include identifying specific information in documents you're saying Northwestern should have asked for, right?

MS. RUGH:   Object to form.

Q.   (By Mr. Sands) Well, let me withdraw that

EXHIBIT H

and ask you this question.

Did you ask Ms. Townsend's attorneys for the Tupa records?

A.   I don't recall.

Q.   But you do recall receiving Sky Ridge records; is that right?

A.   Yes.

Q.   Do you say -- anywhere in your report do you refer to the substance of what's in the Sky Ridge records?

A.   I don't believe I did a summary of the Sky Ridge records, no.

Q.   As you sit here right now, ma'am, do you recall what the Sky Ridge records said about -- or say

55

about Mr. Townsend's cocaine use?

A.   In general, yes, I recall.   But if you -- again, if you want to show me the records, we can go through them; but, in general, I recall, yes.

Q.   And, in general, what do you recall the Sky Ridge records say about Mr. Townsend's cocaine use?

A.   Sure.   In general, what I recall, without looking at the records, is that Mr. -- Mr. Townsend had

EXHIBIT H

used cocaine.

Q.    I would like for you to turn in your report, ma'am, to page 15.

MR. SANDS:    And, everyone, please forgive me.    I've already forgotten what number the report is.

THE COURT REPORTER:    Exhibit 57 is the report.

Q.    (By Mr. Sands) Exhibit 57, page 15, you recall this text box, correct?

A.    Yes.

Q.    And this is the text box that states Mr. Townsend's age of first use of cocaine was 43, correct?

MS. RUGH:    Object to form.

Q.    (By Mr. Sands) Well, is that what it says? We can go through it.    "Substance top three," second line down says, "Cocaine," correct?

56

A.    Correct.

Q.    Then it says -- and I'm just reading what it says -- "Amount/frequency/route:  DO 1-2X, snort," correct?

A.    Correct.

EXHIBIT H

67

A.    Again, I didn't previously state that it's an insurer's obligation or industry standard to go out and verify every single medical record.  What I said was that it's industry standard to complete a thorough, fair evaluation for the claimant and to ensure that you have provided that for the claimant by obtaining additional information and ensuring that your -- that the claims department is reviewing all information available.

Q.    (By Mr. Sands) Bear with me for just a moment.

Don't you agree with me, ma'am, that it is industry standard in the life insurance business that a life insurance company has the right to rely on the information contained in the medical records?  That's industry standard, correct?

A.    To -- that they can rely on that, sure, if that -- if that's the information that was provided.

Q.    Okay.  And do you agree, then, in this case that Northwestern Mutual had the right as a life insurance company by industry standard to rely upon the information contained in the Highlands Behavioral Health record, specifically the box contained that you've inserted into

EXHIBIT H

your report on page 15?

A.    Sure.   Of course, they had that right.

That was the information that was provided, and if they

68

felt that that was a -- part of a complete, thorough

evaluation for the claimant, then that's certainly their

right to rely on the information that they want to rely

on.

Q.    Do you agree with me that a Highlands

Behavioral Health record, specifically the intake form

here that you put at least a part of in your report, it's

part of the Highlands Behavioral Health medical records,

correct?

A.    It's part of the intake note that was the

intake interview for Mr. Townsend when he was transferred

to Highland Behavioral health.

Q.    And it's part of their medical records,

right, Highlands' medical records?

A.    As far as I know it's part of their intake

notes.

Q.    Do you understand my question?  It's part

of Highlands' medical records, correct, ma'am?

MS. RUGH:   Objection, asked and answered.

EXHIBIT H

MR. SANDS:   She hasn't answered it.

MS. RUGH:   She has answered it.

Q.   (By Mr. Sands) So you -- is your answer yes then, that it is part of the medical records?

MS. RUGH:   Object to form.

A.   It's part of the records that Highland

69

houses.  If they call them medical records, they call them medical records.  This is an intake note.

Q.   (By Mr. Sands) Well, by industry standard, as part of the medical records that were provided to Northwestern Mutual, correct?

A.   Can you repeat that?  I missed the beginning.

Q.   By industry standard, this information that's in your report on page 15 in the text box is a medical record, correct?

A.   It is a note from a medical provider or a medical facility.

Q.   Do you know what HIPAA is, the Health Insurance Portability Protection Act?

A.   Yes.

Q.   And do you know that this form -- it would

EXHIBIT H

be covered by HIPAA as a medical record, correct?

A.   Most likely it would.   I doubt the facility would -- would release that without an authorization.

Q.   Bear with me for a moment.  Sorry.  I told you I'd bounce around a little bit here.  I'm trying to be as -- and to get us through this as quickly as I can.

Ma'am, one of the items you reviewed is the deposition of Mr. Repinski.  Do you recall that?

A.   Yes.

70

Q.   And who was Mr. Repinski?

A.   Mr. Repinski was the intake person at Highland Behavioral health.

Q.   And he's the one who you're aware inserted the -- or filled out the form on page -- that's contained in page 15 of your report, correct?

A.   Correct, as far as I'm aware.

Q.   All right.  You have picked just a couple of Mr. Repinski's statements from his deposition.  Did you read his whole deposition?

A.   Yes.

Q.   And do you recall that Mr. Repinski testified that he would accurate -- would have accurately

EXHIBIT H

written down what he was told at that time by Mr. Townsend?

A.    I don't recall that, no.

Q.    Well, assuming he did say that, is there any particular reason you excluded that from your report and only put in what you put in?

A.    I don't recall reading that.   And the second part of the question, I -- I don't know if I don't -- I don't know why I wouldn't have put that in.

Q.    Is -- is it fair to say that what you put in was just that part of the deposition that you believed at the time was favorable to the Townsends' case --

71

Ms. Townsend's case against Northwestern Mutual?

A.    I felt that I put in the sections of the deposition that explained the very information as a claims person that I would have wanted to know at the time of claim before making a decision and that that would have -- as a claims person, that's the type of information I would have wanted to get to make sure that I understood all the facts before making a final decision.

Q.    And -- and so the -- when he said in his deposition, page 50, line 17 through 25 -- when he said --

EXHIBIT H

"Did Mr. Townsend tell you he first used cocaine at age 43?

"ANSWER:   That would have been a question I would have asked him and said, 'When was the first time you used?' and he would have said, "Age 43," is that not information that would be important?   Is that what you're saying?

A.   No, that's not what I'm saying.   That information would be helpful as well.

Q.   But you didn't put it in your report or -- did you?

A.   I don't believe so, no.

Q.   But you can't tell us why you did not include that?

A.   Correct.   I wasn't going to repeat the

72

whole deposition into -- into the report.

Q.   Do you understand, ma'am, that as an expert witness you should approach the file or the case objectively?

A.   Correct.

Q.   Your role is to help the jury to understand technical or scientific -- here probably more technical

things?

A.    Correct.

Q.    Your role is not to be an advocate, correct?

A.    Agree.

Q.    Weren't you acting as an advocate when you kind of cherry-picked parts of Mr. Repinski's deposition that you put in your report?  You didn't put important answers like, "That's what he told me" -- and I'll paraphrase here, "That's what he told me, and I wrote it down"?

MS. RUGH:  Object to form.

A.    No, sir.  I don't believe that I was cherry-picking.  The best way I can explain it is I'm a claims person, and that's my experience.  And my experience would have wanted me to know that information before I made a decision on the claim.

Q.    (By Mr. Sands) Well, wait a minute.  What

73

information?  You mean the -- the parts you put in your report from Mr. Repinski's testimony?

A.    Sure.  Because that would have ensured that we're -- we're giving equality to what Mr. Repinski is

EXHIBIT H

saying; and, you know, he's the voice of Mr. Townsend.  So as a claims person, the goal is to move the claim toward payment and to obtain as much information as you can to lead the claim to payment.

Q.    But you can't tell us, ma'am, when the last time was that you actually handled a life insurance claim, can you?

A.    No.  I don't recall.

Q.    But it was at least more than six years ago, right?

A.    It could have been.  Sure.

Q.    Because the only time you did it was when you were a TPA with Salt, right?

A.    I don't believe Salt was a TPA back then. I don't know if they are now.  But I would have at Salt. Correct.

Q.    And that's the only time you ever would have been involved in a life insurance claim that didn't involve, you know, the one case where you were -- I think said you were testifying as an expert?

A.    Besides Chubb Life.

74

Q.    Chubb Life.  Okay.  Maybe I missed that.

EXHIBIT H

When did you do work for Chubb Life?

A.    In 1994 to '96.

Q.    I'm not good at arithmetic, and I was promised there wouldn't be any when I went to law school. But that's going on 30 years ago; is that right?

A.    It could be.

Q.    Now, just on the face, ma'am, of this Highlands Behavioral Health records -- intake record you, again, inserted into your report, what is it on the face of that information, that text, that you believe suggests Northwestern should have done something more about that information?

A.    Sure.  Just the fact that the -- the questions are about substance abuse.  As a claims person, you're reviewing the questions here that the intake person and on the intake form had.  They're asking about substance abuse within the past -- or substance use within the past 12 months.

One section of the -- the chart he indicates cocaine.  It's not checked off on the above area.  I would -- I would want to clarify because the question asked about substance use within the 12 -- 12 months, I -- I would want to be sure that those questions below -- if the person was still thinking within the past

75

EXHIBIT H

12 months.

I would also want to clarify was it one to two times only?  Was it once?  Was it twice?  Was it in the same day?  How could it only be once but then two different dates given?  Those type of things I would want to clarify.

Q.   Well -- okay.  I'm sorry.  I missed that. You said -- are you saying there's two different dates given in this text?

A.   Sure.  Because he -- the claimant wouldn't have been age 43 in March of 2018.

Q.   Well -- okay.  Is there anything else that you think is inconsistent on the face of this record?

MS. RUGH:  Object to form.

A.   I mean, I just mentioned some things that -- that the -- that cocaine was not checked off.

Q.   (By Mr. Sands) Yeah.  I'm asking you anything else now.  I don't want to -- you don't have to repeat.

A.   No.  Those are the type of things -- you said on -- on the face of this that --

Q.   Right.  And that's what --

A.   -- I would want to --

EXHIBIT H

or psychiatrists or therapists?

A.    Sure.    As -- as a claims person, I would have done that to clarify or to talk about the information from Behavioral Health to see if I could get additional input from the attending physicians.

77

Q.    And do you have any understanding or -- withdraw that.

Do you have any information, as you sit here today, about what any of those individuals might have had to say?

A.    No.    I don't know.

Q.    And can you identify the medical professionals you believe Northwestern Mutual should have contacted?    Who are you referring to, ma'am?

A.    As a claims person, I would have wanted to contact the therapist, Tupa.    I also would have wanted to -- to contact -- I think his last name was Wilner, and another one, I believe, was Saunders [sic].    Just to -- to give the claimant every consideration and, you know, run it by them, "This is the information we have.    We were not aware of it.    We didn't see it in your records.    Can you shed some light on it?"

EXHIBIT H

Q.    But aren't you speculating here and suggesting that there was something those individuals could have provided or would have provided that would have affected the claim determination here?  Aren't you speculating?

A.    Right.  Because we -- we don't know because that's not what happened during the claim.

Q.    You've read their records, or have you not

78

read those records?

A.    I have read the records, yes.

Q.    Yet you can't identify something from any of those individuals that would have been relevant here, correct?

A.    Right.  Besides that the records from the providers that were reviewed by Northwestern did not mention cocaine use.  So the questions would have been to those providers, you know, whether he had mentioned cocaine use or if they had talked about drug use during their appointments.

Q.    Those records don't indicate that the discussions were about -- were about drug use, do they, from those treaters?

EXHIBIT H

A.    Exactly.    And that's why I would have wanted to contact them, to find out if they had information about that.

Q.    So are you saying that -- again, I guess -- how is it that you identify those individual treaters as the ones that Northwestern Mutual, in your belief, should have contacted?

A.    Well, they were his treating providers and they were aware of them and they had information about the claimant and had -- had treated him and seen him at the time of application and then also prior to the claim.

79

Q.    What treatment do you know any of those providers provided to Mr. Townsend?

A.    They were his attending physicians; and from what I know, Tupa was a therapist.

Q.    But you're not able to -- you -- you didn't put it in your report and you're not able to testify today what information it is any of them might have provided relevant to this claim, correct?

A.    Correct.    Because it wasn't done during the claim.

Q.    Well -- all right.    But you're being

EXHIBIT H

critical of Northwestern Mutual -- withdraw that question.

Is it your position in this case that it would have been a violation -- that it was a violation of some industry standard not to contact who you just identified?

A.   It's -- it's a violation of industry standard not to complete a full, fair, equitable evaluation; and part of that evaluation would be diligently seeking out information in support of payment of the claim.

Q.   Okay.  I'm not asking you for platitudes here.  What I'm asking you is, specifically, is it your opinion that Northwestern violated some industry standard by not contacting the providers you just identified?

80

A.   Again, contacting the providers and obtaining information is part of the evaluation.  In not completing an evaluation is a violation of industry standard.

Q.   Wouldn't it be important to you before you give that opinion as an objective expert to know what it is -- know what information it is those individuals would have provided?

EXHIBIT H

A.    No.    That's the point of obtaining the information is to find out what they have to provide.

Q.    But as far -- you're speculating.    As far as you know, they might have provided nothing, right?

A.    Exactly.    And we don't know --

Q.    And you did not --

A.    Excuse me.    I'm not done.

Q.    Go ahead.    Sorry.    I didn't --

A.    We don't know, and that's exactly the point is they certainly could have provided information that supported denial of the claim.    They could have provided information that further supported paying the claim.    The point is as a claims person, you go out and seek information to ensure that your decision is based on facts.

Q.    And any opinion you have regarding those individuals, what information you think they could have

81

provided, is based upon nothing more than speculation, correct?

MS. RUGH:    Object to form, asked and answered.

A.    We don't know what they would have provided

EXHIBIT H

at the time of claim because they weren't contacted at the time of claim.

Q.    (By Mr. Sands) Did you understand my question?

A.    I -- I believe I've answered it several times.  We don't know what they would have provided at the time of claim because they weren't asked.

Q.    You're speculating as to whether they would have provided anything relevant to this claim, correct?

MS. RUGH:  Object to form, asked and answered.

A.    I don't know what they would have provided.

Q.    (By Mr. Sands) Did you ask the Townsends' attorneys to get you that information before you wrote a report that's critical of the Northwestern Mutual?

MS. RUGH:  Object to form.

A.    Not that I recall, no.

Q.    (By Mr. Sands) You mentioned reserving in your report.  You understand that life insurance reserving is entirely different from, let's say, property and

82

casualty insurance reserving, correct?

A.    Sure.  I would assume so.

EXHIBIT H

Q.   Well, I'm not asking you to assume.  I'm asking you about your knowledge.

A.   I'm not -- I'm not all that familiar with property and casualty and the reserving system.

Q.   Well, do you agree that reserving in the life insurance arena is different from reserving in the disability insurance arena, or do you know?

A.   I -- I don't know.

Q.   Is it -- now, ma'am, you cannot say in this case that any additional investigation would have resulted in a different claim decision, can you?

A.   I don't know what Northwestern Mutual would have done.

Q.   I'm not asking you that.  You can't say that any investigation -- let's say that you are saying Northwestern Mutual should have conducted would have resulted in a different claim decision.  You can't say, can you?

A.   I think I lost you.  Can you repeat that, please?

Q.   Sure.  You cannot say that any additional investigation here in this matter would have resulted or should have resulted in a different claim decision, right?

83

↑

EXHIBIT H

A.    I can't say that because I don't know.

Q.    Ma'am, do you agree that insurance companies should pay only claims that are owed?

A.    What was the last part?  That are what?

Q.    Insurance companies should only pay claims that are owed?

A.    By "owed" you mean they should only pay claims that are approved or -- what do you mean by --

Q.    That are owed under the terms of the insurance contract.

A.    Sure.  Insurance companies obviously should pay claims when a person is entitled to benefits.  Yes.

Q.    And you're aware that in Colorado, at least, the industry standard is that insurance companies owe a duty to all members or policyholders to not pay claims that are not owed?

A.    That's my general understanding.  Sure.

Q.    And do you understand that the industry standard in Colorado is not -- that insurance company's conduct is not judged by whether they were ultimately right or wrong?  You understand that, correct?

MS. RUGH:  Object to form.

Q.    (By Mr. Sands) That's not the measure of their conduct.

EXHIBIT H