Jeremiah James Repinski - June 10, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02809-KLM
_____

KAREN TOWNSEND,

    Plaintiff,

vs.

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

    Defendant.
_____

VIDEO VIDEOCONFERENCED DEPOSITION OF
JEREMIAH JAMES REPINSKI
June 10, 2021
_____

VIDEOCONFERENCED APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

    KERRI J. RUGH, ESQ.
    Levin Sitcoff PC
    1512 Larimer Street, Suite 650
    Denver, Colorado 80202
    Phone:  303-575-9390
    Email:  kjr@levinsitcoff.com

ON BEHALF OF THE DEFENDANT:

    MARILYN S. CHAPPELL, ESQ.
    JON F. SANDS, ESQ.
    Sweetbaum Sands Anderson PC
    1125 17th Street, Suite 2100
    Denver, Colorado 80202
    Phone:  303-296-3377
    Email:  mchappell@sweetbaumsands.com
    Email:  jsands@sweetbaumsands.com

Also Present:

    Barbara Horn, Videographer
    Rick Christian
    Clay Greene

Page 1

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

duties, Jero, now.  Were those roughly the same back in October of 2018?

A.    I'm still in the same position.  I'm still doing the same job.

Q.    Okay.  What -- can you just briefly summarize your educational background?

A.    I have a master's degree in community counseling through the University of Northern Colorado. I'm a licensed professional counselor.  I've been licensed since 2001, so twenty -- almost 20 years of being licensed.  My undergrad was in Kalamazoo College in Kalamazoo, Michigan.  I'm also a certified addictions counselor having gone through the DORA-required classes in the early 2000s and '90s.  So I've been CAC II for approximately 20 years as well.

Q.    Okay.

THE COURT REPORTER:  Ms. Chappell?

MS. CHAPPELL:  Yes.

THE COURT REPORTER:  Can we go off the record for just a minute?  I'm having trouble hearing the deponent.

THE VIDEOGRAPHER:  We're going off the record.  The time is 1:18.

(Recess taken from 1:18 p.m. to 1:21 p.m.)

THE VIDEOGRAPHER:  We're back on the record

Page 10

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

worked with incarcerated adolescents.

Prior to AllHealth Network, I was at Mental Health Center of Denver.  Prior to Mental Health Center of Denver, I was at Colorado West Mental Health running a detox facility in Breckenridge and being a substance abuse coordinator for outpatient programs.

Q.   Wow.

A.   So 25 years in community mental health.

Q.   Wow.  What year did you get your undergraduate degree?

A.   I graduated in 2001.  No.  My undergraduate was 1994.  I'm sorry.  My undergraduate was 1994. Graduate was 2001.

Q.   Okay.  Thank you.

Jero, other than brief contact to schedule this deposition, have you had any communication with me or with my office at all?

A.   The only contact I had regarding this case was an investigator showing up at my house asking me if I knew -- showed me a picture of Darren Townsend, asked me if I had remembered him, then showed me some documentation.  And that was -- I don't even know when that was, but at that point I encouraged the investigator to contact United Health Services because I don't know what I could or could not share because of HIPAA and

Page 12

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

confidentiality rules.  So that was the extent of the contact.  I'm not sure who that investigator -- which office that was from but --

Q.   Okay.  Thank you.  I can tell you that was not from our office.  Do you recall when that happened?

A.   No.  I would just be speculating.  It was -- yeah.  I don't even -- I've lost track of time -- I apologize -- for when that was, but it was before COVID.

Q.   Right.  If you -- do you recall what the documentation was?

A.   No.  It was -- I remember him showing a picture, and I remember recognizing the picture.  And I remember it may have been some of my documentation, and I'm guessing here, too.  It may have been my intake paperwork, but I'm not sure.

Q.   Okay.

(Mr. Jon Sands joined the deposition.)

MS. CHAPPELL:  It looks like Jon Sands has been able to join.

Jon, is that you?

MR. SANDS:  It is.  Thank you.

MS. CHAPPELL:  Okay.

MR. SANDS:  And I'm muting my phone.

MS. CHAPPELL:  Okay.

Q.   (By Ms. Chappell) Do you recall anything

Page 13

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

else factually about the visit from the investigator, Jero?

A.   No.   He was very polite.   He was just asking me if I -- no.   That's about it.   I mean, he asked me my name, and I told him, asked him if -- I think he asked if I worked at Highlands and then asked me if I remembered a Darren Townsend, and I didn't initially. Then he showed me a picture, and then I -- it did jog a memory.   And then he showed me, I think, some documentation from his time there.   At that point I pled HIPAA.   I don't know how else to say it.

Q.   Okay.   And so, in other words, you didn't tell the gentleman anything else?

A.   At that point, no.   At that point I realized it was something involving legal proceedings, and I'm a big believer in HIPAA confidentiality rules, and I felt like I had already probably disclosed too much by even acknowledging that I knew the person because, technically, I'm not supposed to confirm or deny if I even know somebody from the hospital setting.   So I felt a little bit blindsided in some ways, but I quickly, I think, regrouped and then clammed up.

Q.   Okay.  I don't want to ask you to divulge any attorney-client communications you might have had with any counsel for Highlands, but, factually, did anything

Page 14

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

MS. RUGH:  Object to form.

A.    That would -- that would have been a question I would have asked him and said, "When was the first time you used?" and he would have said, "Age 43."

Q.    (By Ms. Chappell) And did you have any reason to think Mr. Townsend wasn't being truthful with you when you asked him that question and he gave you an answer?

MS. RUGH:  Object to form, speculation.

A.    I can't recall exactly either.

Q.    (By Ms. Chappell) What do you mean you can't recall?

A.    It's -- I can't remember if he was trying to minimize or -- and I don't know without looking at the end of my documentation.  Typically, if a person is being really -- minimizing their situation or not seeming to be forthright or being an unreliable historian, I will document that as such.  And so if I can look at the last portion, I -- again, I don't know if I documented anything around his presentation in terms of how he appeared or if he appeared to minimize or any concerning type of reporting behaviors.

Q.    Okay.  So let's look at that then.  I'm so sorry, Jero.

A.    It would be the second to -- second to last

Page 51

Veritext Legal Solutions
303-988-8470

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

A.    Actually, backing up a step on -- can I back up a step, too?  Because age of first use may have been different than the age of last use, and so I don't know for sure if his first and last use were the same time period.  So as far as inconsistencies, I don't know if he first tried cocaine at 43, and the last time he used it was March of 2018.

But if that's -- I don't know if that's an inconsistency or what that would refer to, but it may -- if he's done it once or two times total, he may have tried it once at 43 and a second time in March of 2018.  So they would have been different questions in that regard.  The first question --

Q.    Okay.  But in any --

A.    -- would have been when was the age that -- the age of --

Q.    Sorry.

A.    When did you first use cocaine?  And that would have been age 43.  And when was the last time you used cocaine?  March of 2018.

Q.    Okay.  But in any event, you wrote down what he told you, right?

A.    That is correct.

Q.    Okay.

MS. CHAPPELL:  So, now, we can take this

Page 57

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

off the screen.

Q.    (By Ms. Chappell) So, Jero, you've told us earlier you're very conscious of HIPAA and patient privacy and privacy of medical records and so forth, right?

A.    Correct.

Q.    Okay.  So, Jero, what if somebody had called you up back in 2019 and wanted to ask you questions about Darren Townsend's medical records, what would you have done?

A.    I would not have answered, and I would have not -- I would have neither confirmed nor denied I knew the patient in question.

Q.    Okay.

A.    And I would have said to them, "I'm not able to discuss it," and referred it to -- I don't know who I would have referred it to.  It depends on the situation.

Q.    Okay.  Jero, I don't think I have anything else.  I'd like to check my notes, but let's go ahead and see if Kerri wants to ask you some questions, and then I may need to ask you some follow-up.  But at this point I don't have any further -- anything further subject to that.  So thank you.

A.    Thank you.

/ / / / /

Page 58

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

our EMTALA log.  So it should be the same in all three time portions, the time of EMTALA, the time of computer entry, and the time that I would have put on this form.

Q.   Okay.  I want to go back to that section of the form that deals with substance use, page 306.  So you told us, Jero, that your habit and practice in 2018 would be to fill out only the substance top three column prior to doing the actual interview with a patient; is that accurate?

A.   Yeah.  That's -- you've got the wrong portion highlighted.  It's the second -- there it is.  That's the one.  Yes, I would have -- yeah, I would have filled out just the substance top three column.  I was remiss in not checking both boxes on this one, but I don't do a lot of -- I'm not the best box-checker.

Q.   Fair enough.

MS. CHAPPELL:  I'm sorry.  I didn't -- wait.  Hang on.  I didn't understand what you just said.

THE DEPONENT:  I failed to check off the cocaine box on the section of the boxes.  I sometimes would be in a rush or in a hurry, and I would have maybe forgotten to do it on that occasion.  But the fact that I would have written in the name of the drugs in the column -- my own little petty rebellion against the redundancies of the paperwork.

Page 63

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

possible.  So --

Q.   (By Ms. Rugh) Well, let me ask it -- yeah. Go ahead.  Sorry.

A.   It's -- I'm trying -- it's -- because I don't want to -- I don't want to speculate on what I remember and I don't remember about the patient, but it's unusual for a person to only have alcohol and then cocaine use.  And so it would stick out for me to ask them to be a little bit more specific about the cocaine because of -- there's no progression.

It's -- typically, in my experience, I would see a progression of substance use where there would be alcohol and then marijuana and then maybe some hallucinogens and then some cocaine.  In his case, he only acknowledged the two drugs, the alcohol and the cocaine. So it's -- it would have been interesting to me because -- just out of interest in terms of is this an issue for him right now or not in terms of his treatment.

Cocaine is a drug that we tend to see causing a lot of severe depressive reactions, and so a lot of our doctors are very attuned to not liking to admit cocaine-dependent individuals because they don't respond as well to treatment, and so some doctors have had -- made that a real big issue.  And so I did always try and do cocaine a little bit differently so the doctors had that

Page 69

EXHIBIT J

Jeremiah James Repinski - June 10, 2021

information handy because it's a different drug in that regard.

Q.   When you say you tried to handle it a little bit differently, I guess I'm not clear what you meant by that.

A.   More precise, more just trying to gather the information.  I would have probably had more of a conversation with him around it.  Is this something that you do all the time?  Is this something that was just a "once in a blue moon" thing?  How did it happen?  But I don't know exactly what he said in response to those questions other than I wrote down 43, and so I'm led to believe he said 43.

Q.   Or that he gave you an answer and that you helped him, in some way prompted him to come up with a specific year, correct?

A.   Yeah.  Exactly.  And so if he said --

MS. CHAPPELL:  Objection, form.

A.   I would have tried to get a number on there.

Q.   (By Ms. Rugh) Let me ask this question a little bit differently.  Did it matter to you whether Mr. Townsend was actually 43 or actually 44, for example, the first time that he tried cocaine?

A.   No.  What would have mattered to me would

Page 70

EXHIBIT J