Carmen O. Merwin - June 9, 2021

```
            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

   Civil Action No. 1:20-cv-02809-KLM
   _____

   KAREN TOWNSEND,
        Plaintiff,
   vs.
   THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,
        Defendant.
   _____
     VIDEO VIDEOCONFERENCED DEPOSITION OF CARMEN O. MERWIN
                       June 9, 2021
   _____
   VIDEOCONFERENCED APPEARANCES:
   ON BEHALF OF THE PLAINTIFF:
                KERRI J. RUGH, ESQ.
                Levin Sitcoff PC
                1512 Larimer Street, Suite 650
                Denver, Colorado 80202
                Phone:  303-575-9390
                Email:  kjr@levinsitcoff.com
   ON BEHALF OF THE DEFENDANT:
                MARILYN S. CHAPPELL, ESQ.
                Sweetbaum Sands Anderson PC
                1125 17th Street, Suite 2100
                Denver, Colorado 80202
                Phone:  303-296-3377
                Email:  mchappell@sweetbaumsands.com
   Also Present:
                Barbara Horn, Videographer
                Rick Christian
                Clay Greene
```

Page 1

EXHIBIT N

Carmen O. Merwin - June 9, 2021

A.   That would have come from the patient which may or may not be consistent with his other answer for when his date -- last used.  Those were two separate questions.  When did you last use, and how long ago was it?  Those are questions designed to pull out inconsistencies, and, obviously, we have an inconsistency here.

Q.   What do you mean by that, Carmen?

A.   Well, let's see.  The date of the interview was ten -- well, no.  Actually, I guess it is consistent, but that would be why you ask the same question twice in different ways.  Yeah.  It looks like it is consistent.  I'm sorry.  I was trying to do math in my head.  Never a good idea.

Q.   I feel your pain on that subject, Carmen.  What about "Age of onset:  43," do you see that?

A.   Yes.

Q.   Okay.  And where did that -- where did that information come from?

MS. RUGH:  Object to form.

A.   That would have come from the -- from the patient.  That's a specific question, "How old were you when you started using?"

Q.   (By Ms. Chappell) Okay.  So that would not

Page 42

EXHIBIT N

Carmen O. Merwin - June 9, 2021

have been generated by any sort of program?  That was something that came from Mr. Townsend's mouth; is that correct?

A.   That would be correct.

Q.   Did you discuss your report with the attending physician, Dr. Holland?

A.   I discussed the interview with him, and I provided him with the report.

Q.   Do you remember what you discussed more specifically with Dr. Holland?

A.   We discussed things -- I mean, I'm just going to go typically.  I mean, I don't recall even who Dr. Holland is.  If you pointed him out on the street, I probably wouldn't recognize him.  We would have discussed things like risk factors and mitigating factors like what are the things that cause him to be at risk and what are the things that help reduce that risk.  That would be a common discussion to have, but what we talked about -- like I said, I don't even remember who he is.

Q.   Do you know what happened with Mr. Townsend's care and treatment after you did your interview with him?

A.   I do know that the provider recommended admission, and I -- we don't actually follow up on these things because our job is done at the end of the

Page 43

EXHIBIT N

Carmen O. Merwin - June 9, 2021

Mr. Townsend had provided inaccurate information in response to the questions you posed to him in the behavioral health assessment interview but did not do so intentionally?

MS. CHAPPELL:  Objection, foundation.

A.    Yes.

Q.    (By Ms. Rugh) Okay.  And there's no way to know at this point in time, correct, whether he did that or not?

A.    No.  And if you'd asked me when I walked out of the room, I still wouldn't have been able to -- to tell you.

Q.    Right.  Okay.

MS. RUGH:  Let's see here.  If you can go to page 7.  Okay.  Do you -- I'll have a -- yeah.  That first half of the page, if you can blow that up.

Q.    (By Ms. Rugh) Do you see where it says, "Audit C"?

A.    Yes.

Q.    What does "Audit C" mean?  Do you know?

A.    I have no idea.  I have to tell you, this is a very poorly written medical record system.  And, you know, like you asked me about the "Yes" being all capitals, well, it's not consistent.  Some things will come out that way, and some things won't.  There's -- it's

Page 64

EXHIBIT N

Carmen O. Merwin - June 9, 2021

Q.    (By Ms. Rugh) Okay.  Carmen, do you see under "Alcoholic beverages within the last 12 months: Yes"?

A.    Yes, I see that.

Q.    And then underneath that heading, there's the question, "How often do you have a drink containing alcohol?"

A.    Uh-huh.

Q.    And it says, "Two to four times a month," correct?

A.    Uh-huh.

Q.    First of all, is that how you ask the question?

A.    I will ask, "Within the past 12 months, have you drank any alcoholic beverages?"  Pretty much just like that.  "How often do you have a drink containing alcohol?" and "When you have a drink containing alcohol, how many drinks do you typically have?"

Q.    Okay.  So do you see -- okay.  The answer, again, was two to four times a month for that -- that question up there, correct, that we just went over?

A.    Correct.

Q.    And then if you go down a little bit further, under "Type of alcohol," we see hard liquor and mixed drinks.  Yes?

Page 66

EXHIBIT N

Carmen O. Merwin - June 9, 2021

medical records in any way at all?

A.    Other than I told you I couldn't recall this situation and that perhaps it would help my memory if I had them, no.

Q.    Okay.  And if I had -- if -- Carmen, if somebody had asked you questions about Mr. Townsend's medical treatment outside of this deposition, would you have answered those questions?

A.    I'm not sure I understand what you're asking me.

Q.    Okay.  Is there a duty of you as a medical provider to keep a patient's medical records confidential?

A.    Yes.  But you had all my notes and --

Q.    Okay.

A.    -- you had all the medical records.  So there really isn't anything else.

Q.    Okay.  But you're -- you're fine --

A.    I hadn't --

Q.    -- answering --

A.    -- treated him outside of the evaluation.  So there really isn't anything beyond this.

Q.    Okay.  But you were fine answering questions today in the deposition, correct, under -- under oath?

A.    Right.  Because, obviously, you already

Page 90

EXHIBIT N

Carmen O. Merwin - June 9, 2021

have all the information that I'm talking to you about.

Q.   Okay.   But what I'm getting at is you wouldn't -- if somebody picked up the phone and called you and asked about Darren Townsend's medical history, you wouldn't just start answering questions over the phone from some person, would you?

A.   No, of course not.

Q.   Okay.   You would want -- okay.   You would want some indication that there was a legal right to that information, correct?

A.   Yes.

Q.   Okay.   I may be done.   I'd like a couple of minutes to go over my notes, and if we could take, like, a two-minute break, that would be great.   Thank you.   I believe I'm done, but I just want to double-check a couple of things in my notes.   Okay?

A.   Okay.

Q.   And then I promise you we will be done soon, Carmen.   Thank you.

THE VIDEOGRAPHER:   We're going --

A.   All right.

THE VIDEOGRAPHER:   We're going off the record at 1:43.

(Recess taken from 1:43 p.m. to 1:45 p.m.)

THE VIDEOGRAPHER:   We're back on the record

Page 91

EXHIBIT N